[Civ. No. 32462. Second Dist., Div Four. June 18, 1969.]

ISAIAH R. WAGNER et al., Plaintiffs and Appellants, v. PAT O'BANNON, Defendant, Cross-complainant and Respondent; POMONA VALLEY BOARD OF REALTORS, Defendant, Cross-defendant and Respondent; JUANITA De La ROSA, Cross-complainant and Appellant.

Daniel N. Fox for Plaintiffs and Appellants.

Gerald L. Rosen and Jane R. Brady as Amici Curiae on behalf of Plaintiffs and Appellants.

Alexander Ruiz for Cross-complainant and Appellant.

John W. Fay for Defendant, Cross-complainant and Respondent.

Charles F. Day, Moses Lasky and Brobeck, Phleger & Harrison for Defendant, Cross-defendant and Respondent.

FILES, P. J.—This action commenced with a complaint filed by plaintiffs, a Negro couple, alleging that, in a real estate transaction, the defendants had discriminated against them, violating Civil Code sections 51 and 52.[1] The parties include real estate brokers, a realty board, and the seller of the property which plaintiffs sought to buy. After a court trial, all parties having waived a jury, judgment was entered denying any relief to plaintiffs and awarding one of the brokers a judgment on a cross-complaint against the seller for a commission. The plaintiffs and the losing cross-defendant are appealing from the judgment. The latter also appeals from the order denying her motion to vacate the judgment under Code of Civil Procedure section 663, but raises no point not reviewable on her appeal from the judgment.

In order to identify the issues on these appeals a historical review of events is necessary.

August 12, 1963, Mrs. Juanita De La Rosa, owner of a residence at 267 East Harrison Street in the City of Pomona, executed an "exclusive right listing" with real estate broker Pat O'Bannon. This agreement granted to the broker the exclusive and irrevocable right to sell the property until October 15, 1963, for a price of $14,500. Terms indicated were "Cash to new loan, F.H.A., V.A. or conventional." The listing was on a printed form headed "Multiple Listing Service of Pomona Valley Board of Realtors."

The property was at that time vacant.

On Augst 29, 1963, Charles B. Allen, a broker member of the Pomona Valley board, advertised this property in a newspaper.

Mr. and Mrs. Wagner (plaintiffs) saw the advertisement

---

[1]Civil Code section 51: "This section shall be known, and may be cited, as the Unruh Civil Rights Act.

"All persons within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

"This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every color, race, religion, ancestry, or national origin."

Section 52: "Whoever denies, or who aids, or incites such denial, or whoever makes any discrimination, distinction or restriction on account of color, race, religion, ancestry, or national origin, contrary to the provisions of Section 51 of this code, is liable for each and every such offense for the actual damages, and two hundred fifty dollars ($250) in addition thereto, suffered by any person denied the rights provided in Section 51 of this code."

and called the Allen office. On Saturday, August 31, 1963, Kyle Morison, a salesman employed by Allen, showed the house to the Wagners and they decided they wanted it. They gave Morison a $100 deposit and executed a "California Real Estate Association Standard Form" deposit receipt whereby they offered to purchase the property for a price of $14,500 on this condition: "Purchaser to finance entire purchase price with Cal. Vet loan. In the event of rejection by Cal Vet or lender, purchasers' deposit to be refunded in full." The writing also provided "This offer shall be deemed revoked unless accepted in writing within 5 days. . . ." The form was signed by Mr. Wagner, Mrs. Wagner, and Allen Realty by Kyle Morison.

Sunday, September 1, Morison telephoned the office of Pat O'Bannon and was informed that the latter was away over the Labor Day weekend and would return Tuesday, September 3.

September 3, according to Morison's statement, he called O'Bannon on the telephone and told him of the offer and that the Wagners were Negroes.

September 5, according to Allen, he telephoned O'Bannon and told him there was an offer from a Negro couple for the Harrison Street property and "because of the complexities we possibly could work this offer out in our own office." By this latter statement Allen meant he would try to persuade the Wagners to buy somewhere else.

O'Bannon denied having heard of the Wagner offer until September 9.[2]

September 8, Morison told the Wagners this house had been sold to someone else before their offer had been made and offered to show them other houses.

Meanwhile the house was still being shown and offered to prospective buyers who were Caucasian.

September 9, the Wagners consulted an attorney, who prepared a letter addressed to O'Bannon, Allen, Morison, and the realty board, demanding that "this sale be consummated at once." A copy of this letter was delivered to Allen that day. Allen took the letter to Mr. E. A. Bettencourt, president of the realty board, who advised Allen to present the offer to O'Bannon immediately.

---

[2]This was O'Bannon's testimony. The evidence also includes a written statement taken by an investigator for the State Division of Real Estate, and signed by O'Bannon, admitting that on September 4 Allen told him he had "a colored customer" for this house.

About 6 p.m. on September 9, Allen went to O'Bannon's home and there showed him the Wagners' offer and their attorney's letter. O'Bannon found he had no telephone number for Mrs. De La Rosa, so he sent her a telegram asking her to call him.

September 10, Mrs. De La Rosa telephoned O'Bannon. That afternoon O'Bannon, Allen, Morison and Mrs. De La Rosa met in O'Bannon's office. There is some conflict in the evidence as to exactly what occurred there, but it is not disputed that they discussed the fact that the Wagners were Negroes.

Following that meeting Mrs. De La Rosa told O'Bannon that Allen "irritated" her, and that she wanted O'Bannon to find a buyer for her. O'Bannon said he would try to find one.

Later on that same day, September 10, the Wagners and Morison met in the office of the Wagners' attorney. There the Wagners signed a new deposit receipt, similar in form to the one signed August 31, except that the expiration clause was marked out and these words inserted: "This offer good until rejected in writing by seller, or until withdrawn in writing by buyer."

The following morning Allen handed this new deposit receipt to O'Bannon.

The evening of September 10, a saleswoman from O'Bannon's office called upon Mr. and Mrs. Paine, a Caucasian couple, who had looked at the Harrison Street house four or five months earlier. The saleswoman told the Paines they could buy the house without a large down payment, and could have immediate possession. That same evening the Paines signed a standard form of deposit receipt whereby they agreed to purchase the property on these terms: Price $14,500; cash down $100; the balance within 150 days of acceptance by the seller. "Sale contingent upon buyer obtaining a F.H.A. Loan for $14,050. Buyer will occupy property on a monthly rental of $90 per month and will apply for the F.H.A. loan within 90 days. Seller agrees to pay $350 of buyer's loan and escrow fees."

On the following morning, September 11, O'Bannon telephoned Mrs. De La Rosa, told her of this offer, and obtained her oral permission for the Paines to move in. The Paines completed their move to the Harrison Street property on September 13. On September 14 Mrs. De La Rosa signed the Paine deposit receipt, and O'Bannon wrote in September 12 as the date of her acceptance.

On September 13, 1963, this action was filed, naming as defendants O'Bannon, Allen, Morison, Pomona Valley Board of Realtors[3] and "Does I, II, III, IV." A temporary restraining order was issued enjoining the defendants and others from moving anyone onto the premises at 267 East Harrison, or doing any acts in furtherance of a sale of that home to persons other than plaintiffs; but the order was not served until the Paines were in the house. Mrs. De La Rosa and the Paines were served as parties sued by fictitious names.

Following a hearing and conference with the court held on September 27, 1963, a stipulation was entered into between plaintiffs, O'Bannon, and the Paines, pursuant to which the court made an order to this effect: that on October 5, 1963, at 10 a.m. the respective offers of the Wagners and the Paines would be presented to Mrs. De La Rosa at the office of the Wagners' attorney;

that if she selected the Wagners' offer, the action would be dismissed with prejudice as to O'Bannon and the Paines, and releases would be exchanged;

that if Mrs. De La Rosa selected the Paines' offer, the action would be dismissed with prejudice as against the Paines and without prejudice as against Mrs. De La Rosa;

that the temporary restraining order would remain in effect in all other respects pending a further hearing on October 7, 1963.

What happened on October 5, 1963, has not been disclosed to the court, except that Mrs. De La Rosa did not at that time make a selection. On October 7 the hearing was continued to October 18. On that day, after a conference in chambers, a minute order was made: "Pursuant to stipulation in open court, the Court orders: Temporary Injunction will not issue; all restraining orders are to be dissolved. Plaintiff to amend complaint and file with the Court on or before November 8, 1963."

On October 18, 1963, Mrs. De La Rosa answered the complaint and cross-complained against O'Bannon, Allen, Morison and the realty board, charging deceit, and praying $99,500 in damages.

On November 8, 1963, plaintiffs filed an amended complaint.

On January 24, 1964, O'Bannon answered the De La Rosa cross-complaint, and filed his own cross-complaint against Mrs. De La Rosa for $870 as a commission.

---

[3]The complaint also names as a defendant the "Pomona Valley Multiple Listing Service," which is not a separate entity, but an activity conducted by the board.

January 27, 1964, the Paines answered the amended complaint and cross-complained against Mrs. De La Rosa for damages for breach of her contract to sell.

On March 14, 1964, the Wagners moved into the Harrison Street house. The terms of the arrangement by which they obtained possession are undisclosed.

March 23, 1964, plaintiffs dismissed the Paines as defendants, with prejudice.

March 25, 1964, the Paines dismissed their cross-complaint against Mrs. De La Rosa.

April 8, 1964, plaintiffs dismissed the action as to Mrs. De La Rosa.

April 10, 1964, Mrs. De La Rosa dismissed her cross-complaint as against the Paines.

A pretrial conference was held April 7, 1966.

The trial commenced June 30, 1966.

On July 11, 1966, defendant O'Bannon, by leave of court, filed an amendment to his answer alleging for the first time that the court had made an order on September 27, 1963, which had provided for O'Bannon's dismissal ''upon the plaintiffs' consummating the purchase of the residence referred to,'' and that the terms of that order had been complied with and O'Bannon was entitled to a dismissal.

The taking of evidence was concluded July 14, 1966, and the case was submitted on written briefs. As of that time the main action was pending only against O'Bannon, Allen, Morison and the realty board. Mrs. De La Rosa's cross-complaint was pending only against O'Bannon and the realty board. O'Bannon's cross-complaint was against Mrs. De La Rosa only.

On February 10, 1967, the trial judge filed a memorandum opinion, which was followed by findings of fact and a judgment signed and filed April 14, 1967.

The trial court's findings, as amplified by the memorandum opinion, indicate that the decision was placed on these grounds:

(a) Mrs. De La Rosa rejected the offer of the Wagners as her own decision, and as the court believed she was entitled to do, she being the owner of the property. Her subsequent decision to sell to plaintiffs was a result of pressure.

(b) There was no conspiracy or concert of action among the defendants.

(c) O'Bannon was entitled to a dismissal in accordance

with the stipulation and order of September 27, 1963, because the Wagners eventually acquired the property.

(d) O'Bannon negotiated the sale to the Paines, on behalf of Mrs. De La Rosa, for which he was entitled to a commission.

Judgment went against plaintiffs on their complaint, against Mrs. De La Rosa on her cross-complaint, and in favor of O'Bannon on his cross-complaint for a commission.

### The Issue of Discrimination

There was no finding on the factual question whether Allen, Morison and O'Bannon had discriminated against the plaintiffs in the conduct of the real estate brokerage business, the court apparently having believed that Mrs. De La Rosa's refusal to sell was a complete defense for the brokers. This does not follow.

The business of a real estate broker is subject to the requirements of Civil Code sections 51 and 52. (*Lee* v. *O'Hara* (1962) 57 Cal.2d 476 [20 Cal.Rptr. 617, 370 P.2d 321].) Ordinarily a broker or salesman, upon receiving a bona fide offer for a listed property, will make a prompt and diligent effort to present the offer and aid the prospective buyer and seller to reach an agreement. The strange way in which the plaintiffs' offer was handled by these brokers, along with the other circumstances shown in the record, would support a finding that the defendant brokers were denying to plaintiffs, by reason of their race or color, the full benefit of the brokers' services. If there was discrimination, then, under section 52, plaintiffs are entitled to $250 in addition to actual damages suffered. The failure of the trial court to find on this basic issue makes a retrial necessary.

Even if the trial court was correct in believing, under the then existing law, that the owner was free to refuse to sell to plaintiffs for any reason, that does not dispose of this case. This suit, as it went to trial, and now, is not against an owner, but against brokers and an incorporated association of brokers.

In *Vargas* v. *Hampson* (1962) 57 Cal.2d 479 [20 Cal.Rptr. 618, 370 P.2d 322], the Supreme Court decided that a broker would not necessarily be guilty of a denial of his services under sections 51 and 52 simply because an owner refused to sell. The court said (at p. 481): "In some circumstances, of course, both a broker and an owner may be guilty of discrimination, but a broker who in good faith does all within his power to serve a member of a racial minority is not liable if

the broker's failure to complete the transaction is due solely to the owner's refusal to sell because of the buyer's race or color.''

In the case at bench, the gravamen of the charge is that defendants not only failed to perform their duties as brokers, but they went farther and, by concerted action, caused others to deny such services to plaintiffs.

### The Position of the Realty Board

Both O'Bannon and Allen were members of the Pomona Valley Board of Realtors, a nonprofit corporation which operated a multiple listing service for the benefit of its members. In the ordinary course of business a listing of one member is disseminated through the service to all other members, who are authorized to solicit offers from prospective purchasers. Under the bylaws of the board, the listing broker must present all offers submitted through fellow members, and the commission is divided between them if a sale is made. The bylaws also provide machinery for arbitration of disputes between members, and for disciplining members who engage in unethical conduct. The agreement between Mrs. De La Rosa and O'Bannon, listing her house for sale, was on a printed form which included these statements: ''It is understood said Broker is a member of the Pomona Valley Board of Realtors and its Multiple Listing Service; and it is further agreed said Service shall refer this listing to such members as it may deem advisable, and that such members may act as sub-brokers in procuring or attempting to procure a purchaser in accordance with this agreement, . . .'' At the bottom of the page, just above the signatures, this language appears in boldface capital letters: ''The Pomona Valley Board of Realtors will acknowledge receipt of this listing to owner.''

The evidence supports the inference that the board of realtors exercises some supervisory influence over the conduct of business by its members. There is also evidence in this record that Negroes live only in certain neighborhoods in the Pomona area, and do not live in the neighborhood where Mrs. De La Rosa's house was located. Mrs. Wagner testified that she had looked for a house for two and a half years, and had never been shown a house except in certain localities. A Pomona high school teacher, who was a Negro, testified to similar difficulty, and told of how salesmen had on occasion told him they could not submit his offer because he was Negro.

In this context, if it is determined as a fact that Allen and O'Bannon were trying to avoid a sale of the Harrison Street

house to plaintiffs, that conduct, which was contrary to their own economic interest in earning a commission, tends to support the inference that they were governed by some group understanding or outside pressure.

The evidence in this record, as a whole, supports an inference that the treatment accorded plaintiffs in this transaction was a part of some kind of group plan or understanding. When one considers the relationship of the Pomona Valley Board of Realtors to its members, as shown by this record, it is easy to conclude that if racial discrimination is the way of life for real estate brokers there, the realty board is the instrumentality through which it is promoted and maintained. The inference is strengthened by the fact that Allen took the plaintiffs' offer to the president of the realty board before submitting it to the listing broker.

Counsel for the board has argued, and the trial court apparently agreed, that the realty board is not a business establishment within the meaning of Civil Code section 51. Nothing is gained by arguing about that. The business establishments which are charged with unlawful discrimination against plaintiffs are those of its broker members.

The express language of section 52 imposes liability upon anyone who aids or incites a denial of equal privileges; and the common law rules applicable to joint tortfeasors will reach the realty board if the evidence shows that it was a party to an agreement or concerted action to inflict the wrong complained of. ■■ Such a combination, sometimes denominated a civil conspiracy, is not necessarily based upon an express agreement, and it may be shown by circumstantial evidence. (See *Wells* v. *Lloyd* (1936) 6 Cal.2d 70, 82 [56 P.2d 517]; *Revert* v. *Hesse* (1920) 184 Cal. 295, 303 [193 P. 943]; *Balistreri* v. *Turner* (1964) 227 Cal.App.2d 236, 241 [38 Cal. Rptr. 553].)

■■ We note that the trial court included in its "findings of fact" a statement that "It is not true that at any time during these transactions that all or any of the defendants or cross-litigants in this action were involved in or were acting pursuant to a conspiracy or concert of action of any kind."

The statement that the defendants did not act "pursuant to a conspiracy" is only a legal conclusion, based upon the trial court's erroneous view of the law. It is beyond dispute, as a factual matter, that the defendants were acting in concert in many respects. The question the trial court failed to answer is whether a civil wrong was inflicted, through concerted action or otherwise. On retrial it will be necessary to determine, as a

factual matter, whether anyone discriminated against plaintiffs because of their race or color and, if so, which parties are legally responsible for the wrong.

## O'Bannon's Dismissal

The trial court concluded that O'Bannon was entitled to a dismissal on the independent ground that plaintiffs had agreed to dismiss him by the stipulation of September 27, 1963. The record contains no evidence concerning that stipulation except what is recited in the minutes of the court and the formal order which followed. The judge who received the oral stipulation and made the order was not the judge who tried the case, so the trial judge was in no better position than this reviewing court to interpret the agreement which was made. It thus becomes our duty to determine whether the trial court's interpretation was erroneous. (See *Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

That agreement, described above, was entered into just two weeks after the action was filed, as a formula for a quick disposition of the case as between plaintiffs, O'Bannon, and the Paines. At the time this agreement was made there was in effect a restraining order prohibiting consummation of the sale to the Paines, and the parties agreed that the restraining order would remain in effect pending a further hearing to be held on October 7, 1963.[4] On that date the hearing was continued to October 18, at which time a different judge made an order, by stipulation, dissolving the restraining order and granting plaintiffs leave to file an amended complaint.

In this context the most reasonable interpretation is that the settlement plan had failed, there had been no election as had been contemplated on September 27, and the lawsuit was to go ahead. It is true that the September 27 order provided "that the hearing of October 7, 1963, shall be further continued if it appears necessary that the owner of the property herein questioned, Juanita De La Rosa, requires more time to make a decision. . . .", but there is no indication that she required time beyond October 18, when the parties returned to court and stipulated to a dissolution of the restraining order.

The testimony of Mrs. De La Rosa was to the effect that she had been completely satisfied with the Paine transaction, and

[4]There is no evidence of what happened on October 5, but during the trial plaintiffs' attorney told the court that Mrs. De La Rosa did not make any choice on October 5, and that the question of who would get the house was not resolved until March 1964.

that she later sold to plaintiffs because of the pressure of the lawsuit. It will be noted that the September 27 agreement would have given her a dismissal if she chose the Paines, but not otherwise. Her subsequent decision to convey to plaintiffs was apparently due to some other arrangement which she made with plaintiffs after the September 27, 1963, stipulation had lapsed.

The findings of the trial court, so far as pertinent to this issue, are in conflict with the court's conclusion. O'Bannon was not entitled to a release unless, in the language of the stipulated order, the owner did "select the offer of the plaintiffs Wagner." The trial court found, in its finding number 12, that "It is not true that defendant De La Rosa accepted plaintiffs' offer set forth in the deposit receipt dated August 31, 1963, nor any other deposit receipts or offers or instruments executed by or for plaintiffs."

The subsequent conduct of the parties is consistent with our interpretation, and inconsistent with the trial court's conclusion that the September 27, 1963, arrangement was carried out, so as to release O'Bannon. Immediately after the October 18, 1963, hearing, plaintiffs filed an amended complaint which included all of the original parties, and the litigation went forward. Answers and cross-complaints and answers to cross-complaints were filed. Plaintiffs dismissed the Paines and Mrs. De La Rosa shortly after plaintiffs obtained possession of the premises on March 14, 1964, but they did not dismiss O'Bannon. O'Bannon filed his answer to the complaint February 28, 1964. It contains no mention of any agreement to release him. His pretrial statement dated March 28, 1966, makes no such contention.

In a written motion for judgment on the pleadings, filed on June 30, 1966, the opening day of the trial, defendant O'Bannon argued his theory that the complaint was defective; but even then no mention was made of any agreement to dismiss and release him. It was not until July 5, 1966, in a colloquy with the court, that O'Bannon's trial attorney (who had not been in the case in 1963) first claimed that his client was entitled to a dismissal under the September 27, 1963, stipulation. If O'Bannon or his attorney had had any faith in that theory it is inconceivable they would have gone through two and a half years of trial preparation before mentioning that he had been released by an event occurring in March 1964.

The trial court's conclusion that O'Bannon was entitled to a separate dismissal is unsupported by this record.

### *Mrs. De La Rosa's Cross-complaint*

██ The cross-complaint of Mrs. De La Rosa alleged that the brokers had deceived her, to her damage, in failing to tell her the truth about the Wagners' offer and in misrepresenting to her the terms of the Paines' offer. At the trial she testified that the brokers never showed her the deposit receipt or the letter from the Wagners' attorney when the offer was discussed on the morning of September 10, 1963.

Mrs. De La Rosa's testimony includes this:

"A. These people that wanted to buy my home were Negroes and he [Allen] wanted me to know about it before I decided. To that I answered, 'Fine.' He continued, saying that I had to think about it and consider the neighbors and he went on and on.

"Q. And then was there any further discussion that you can recall at this present time?

"A. Then I said, when he was through talking, I said, 'What if I should sell to the Negroes?' And there was silence, and then Mr. O'Bannon said, 'Our names will be mud.' There was another silence.

To that I said, 'Well, gentlemen, I like to take time to think this over.' With that Mr. Allen got up immediately and immediately he left.

"Q. BY MR. RUIZ: Did a discussion continue at Mr. O'Bannon's office?

"A. Yes. I told Mr. O'Bannon that I wanted him to find me a buyer, that he should be the one that should find me the buyer, not Mr. Allen.

" . . . . . . . . . . .
I told Mr. O'Bannon, 'That man irritated me. He means well. I don't want to have nothing to do with him. I don't want him [*sic*] to talk to him. I want you to find me the buyer, Mr. O'Bannon. It is you I want to find a buyer.'"

Allen testified that at the September 10 meeting he handed the Wagner deposit receipt to Mrs. De La Rosa and told her this was a full price offer which would net her more money than if the sale were financed by F.H.A. After about five minutes of discussion O'Bannon told Allen and Morison he would let them know later, and they left.

There was no evidence that Mrs. De La Rosa was misinformed as to the terms of the Paine transaction.

On that record the trial court could reasonably conclude that Mrs. De La Rosa learned as much as she wanted to know about the Wagner offer and that she made her own decision to

refuse to deal with them, uninfluenced by any deception on the part of the brokers. This finding, based on substantial evidence, supports the judgment denying her any recovery on her cross-complaint.

It should be noted that the findings against Mrs. De La Rosa on the cross-complaint, based as they are upon her own testimony, are not binding upon plaintiffs. At a retrial of the main action plaintiffs are entitled to prove whatever they can about the reasons for the events of September 10, 1963.

### *O'Bannon's Cross-complaint*

O'Bannon's case against Mrs. De La Rosa was simply that after she made her decision not to deal with the Wagners, she asked him to find another buyer, he found the Paines, and she accepted the Paines' offer. Under the terms of the written listing agreement she thus became obligated to pay a 6 percent commission on the Paine transaction. The trial court's findings in favor of O'Bannon on his cross-complaint are supported by evidence in the record.

Although Mrs. De La Rosa has made no contention that her purported sale to the Paines was a sham or an act done in furtherance of a conspiracy to violate the civil rights law, this court must consider what the evidence reveals. "Whatever the state of the pleadings, when the evidence shows that the plaintiff in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids. [Citations.] It is immaterial that the parties, whether by inadvertence or consent, even at the trial do not raise the issue. The court may do so of its own motion when the testimony produces evidence of illegality." (*Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 147-148 [308 P.2d 713].)

There do not appear to be any countervailing circumstances which would call for an exception to that rule in this case if O'Bannon's performance is found to have been illegal.

When Mrs. De La Rosa asked O'Bannon to find another buyer he produced an offer from the Paines that is remarkable both for its timing and its terms. The Paines had looked at the house months before and had failed to buy. On September 10 O'Bannon offered it to them on terms which amounted to no more than a rental agreement for six months with an obligation to buy only if they could qualify for a loan amounting

to all but $100 of the actual price (since the seller was to put in $350, an amount equal to the remainder of the stated price).

Unless the availability of such financing had been explored in advance, the terms suggest that the parties did not actually expect the sale to be consummated. Placing the prospective buyers in possession so quickly, and before they had demonstrated their ability to pay, is a further indication that the purpose was not to sell, but to place possession for the time being in a Caucasian family under color of an equitable interest.

This arrangement appears less like a broker's normal effort to accomplish a sale than a device to prevent one.

The confrontation of September 10 was unquestionably a traumatic experience for Mrs. De La Rosa. O'Bannon testified that she was upset and seemed close to tears. A broker uninhibited by racial considerations might well have given her another chance on another day to accept the Wagner offer. What O'Bannon did was to commit her to another transaction, so that she could not change her mind if she wanted to. O'Bannon's conduct, though with his client's consent, was so remarkable a departure from what would be expected of a broker absent the racial problem that it may reasonably be held to be a further act in carrying out a conspiracy to deny to the Wagners the benefit of the services of a real estate broker.

Inasmuch as the trial court never decided whether the brokers were guilty of discriminating against the Wagners, it never considered that aspect of the Paine transaction. On retrial the court will evaluate O'Bannon's conduct on and after September 10 in the light of all of the evidence on the alleged concert of action to discriminate. If it is found that O'Bannon procured the Paine transaction for his own purpose of foreclosing any reconsideration of the Wagner offer by Mrs. De La Rosa, he cannot recover compensation.

Our conclusion that the trial court erred is based upon the law of California as it was at the time of the trial. Since then, in *Jones* v. *Alfred H. Mayer Co.* (1968) 392 U.S. 409 [20 L.Ed.2d 1189, 88 S.Ct. 2186], the United States Supreme Court has decided that an owner's refusal to sell a home to a Negro for the sole reason of his race is a violation of a federal statute (42 U.S.C. § 1982). On retrial, the trial court must also consider the effect of this decision in evaluating the con-

138

duct of Mrs. De La Rosa and the brokers with whom she dealt.

Of course, we do not, on this appeal, attempt to determine the facts. The record suggests other inferences which would entitle O'Bannon to his commission. On the retrial, the court might determine that Mrs. De La Rosa rejected the Wagner offer not because of race, but simply because she was unwilling to deal with Allen or any client of Allen, and that O'Bannon's hurried delivery of the Paines as alternative buyers was out of a desire to help her—originally his client and not Allen's—to avoid further relations with the latter.

On a retrial, the parties and the court can offer and consider such testimony as may then be available in the light of the various possible motivations for the existence of the Paine transaction.

*Other Issues*

There remain for discussion a few additional points which may be of interest on a retrial.

 When plaintiffs' attorney attempted to interrogate defendant Allen concerning his state of mind between August 31 and September 9, 1963, the court stopped him with the statement "The intent makes no difference." This ruling was error. The improper purpose is an essential element of the kind of refusal or denial of services which constitutes a violation of sections 51 and 52. Although the purpose of the defendants may be established by circumstantial evidence, it is also proper to ask directly of the person whose state of mind is in issue. "Whenever the motive or intent with which an act is done is relevant, direct testimony is admissible, although not conclusive." (*Cope* v. *Davison* (1947) 30 Cal.2d 193, 200 [180 P.2d 873, 171 A.L.R. 667].)

 To support the contention that a general scheme of discrimination exists in the Pomona area, plaintiffs' attorney offered in evidence an advertisement placed by a Negro real estate broker in the advertising section of the telephone directory. This advertisement states "We handle unrestricted property." Objection to this offer on the hearsay ground was sustained. This ruling was proper. The advertisement was only the unsworn extrajudicial declaration of the advertiser, without any indication that the defendants or anyone else had acquiesced in the truth of it. As such it was hearsay. (See Evid. Code, § 1200.) No applicable exception to the hearsay rule has been suggested by plaintiffs and we know of none.

On October 2, 1964, the court made an order that plaintiffs

furnish to defendants the names of witnesses plaintiffs intended to call respecting the alleged conspiracy. Plaintiffs complied by furnishing such a list. At the trial plaintiffs attempted to call three other witnesses who had not been so listed, but the court refused to receive their testimony.

To eliminate the problem for the future, plaintiffs may, after remand, move for a modification of the previous order, to provide a new time limit for supplying names of witnesses, which limitation should allow plaintiffs adequate time to prepare a current list and allow defendants enough time before trial to make their own preparation.

The amended complaint on which this case was tried was drafted in November 1963. If plaintiffs desire to amend it prior to retrial they should be given leave to do so.

The judgment is affirmed only insofar as it denies any recovery upon the cross-complaint of Juanita De La Rosa. In all other respects it is reversed.

The appeal from the order denying Juanita De La Rosa's motion to vacate the judgment in favor of O'Bannon on his cross-complaint is dismissed as moot. Costs on appeal are allowed to plaintiffs only.

Jefferson, J., and Kingsley, J., concurred.

The petitions of the cross-complainant and appellant and of all the respondents for a hearing by the Supreme Court were denied August 13, 1969.