**WHEATLEY HEIGHTS NEIGHBOR-HOOD COALITION et al.,
Plaintiffs,**

v.

**JENNA RESALES CO. et al.,
Defendants.**

No. 76 C 409.

United States District Court,
E. D. New York.

March 15, 1978.

Eisner, Levy, Steel & Bellman by Richard F. Bellman, New York City, for plaintiffs.

Goldson & Goldson, Mineola by Howard W. Goldson, Mineola, for defendant Multiple Listing Service of Long Island, Inc.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

This is a class action brought to redress alleged violations of section 804 of the Fair Housing Act of 1968 (Title VIII), 42 U.S.C. § 3604; 42 U.S.C. §§ 1981 and 1982; and the thirteenth amendment. Jurisdiction is based on 42 U.S.C. § 3612 and 28 U.S.C. § 1343. Plaintiffs, the Wheatley Heights Neighborhood Coalition, an *ad hoc* group of white and black residents of the Wheatley Heights area of the Town of Babylon, New York, and individual homeowners in that area, assert that defendants, three real estate brokerage firms and their employees, and the Multiple Listing Service of Long Island, Inc. ("MLS"), have engaged in acts of "racial steering," acts which plaintiffs charge are unlawful and racially discriminatory.

At the outset of this action, defendant MLS moved for summary judgment dismissing the complaint, claiming, in effect, that plaintiffs had failed to state a cause of action against it. MLS at that time argued that plaintiffs' theory of liability, based essentially on the doctrine of *respondeat superior,* was unsupportable because MLS does not control the conduct of its participating brokers. By memorandum order, dated May 3, 1976, this court denied the MLS motion as premature, because it could not then be said that plaintiffs would be unable, through discovery, to adduce facts requiring the imposition of liability on MLS. At that stage in the litigation it was not clear whether or to what extent MLS controls or shares responsibility for the conduct of participating·brokers.[1]

---

1. This approach has since been adopted by at least one other district court. See *Fair Housing Council of Eastern Bergen County v. Eastern Bergen County Multiple Listing Service,* 422 F.Supp. 1071 (D.N.J.1976). See also *Wagner v. O'Bannon,* 274 Cal.App.2d 121, 79 Cal.Rptr. 44 (2d Dist. 1969).

Plaintiffs now having had ample opportunity to conduct discovery, MLS has renewed its motion for summary judgment, asserting that plaintiffs have failed to develop a factual basis for their action against MLS. For purposes of this motion, MLS does not controvert any of the factual allegations set forth by plaintiffs in their opposing papers; it is the position of MLS that on the facts alleged it is entitled to judgment as a matter of law.

MLS is a wholly-owned subsidiary of the Long Island Board of Realtors, Inc. ("LIBOR"), incorporated under section 402 of New York's Business Corporation Law. Participation in MLS is limited to licensed real estate brokers who are members in good standing of LIBOR and are active in the MLS business area of Queens, Nassau and Suffolk Counties. Participants are required to attend an MLS orientation course, and must agree to adhere to the MLS rules and regulations and code of ethics. For new participants there is generally an initiation fee of $500 for each office operated, and annual dues of $300. In addition, there is a $10 service charge for each listing a participant submits to MLS.

MLS has divided the area it serves into 15 geographic zones. When an MLS participant obtains a listing for a residential property, he is typically required to use an "exclusive right to sell" listing form agreement approved by MLS. Within 48 hours after obtaining the seller's signature on the agreement form, the participating "listing broker" must submit the agreement, together with a photograph of the property and an information card, to MLS for dissemination of pertinent details to all MLS participants who have requested the daily listings for the zone in which the property is located. If, however, the seller has elected not to have his property listed through the MLS system, the participating broker may accept a so-called "office exclusive" listing, but he may do so only after informing the seller of the advantages of a multiple listing and obtaining the seller's acknowledgement on a form provided by MLS. The broker must then submit to MLS a copy of the office-exclusive agreement and the seller's acknowledgement, together with a filing fee. It should be noted that MLS brokers are prohibited from actively soliciting office exclusives, and that MLS does, in any event, reserve the right to reject listings deemed contrary to the public interest.

Once a property has been listed through MLS, any participating broker may undertake to effect its sale, subject to certain rules established by MLS. Pursuant to these rules, the "selling broker" acts solely in the capacity of a subagent; the listing remains the property of the listing broker and it is he who has the right to determine how the commission is to be split if the sale is consummated as a result of the multiple listing (the most common split is 35% to the listing broker, 65% to the selling broker). Participants are, of course, prohibited from sharing listings obtained from MLS with non-participating brokers.

The part played by MLS listings in the sale of residential properties within its business area is substantial. For the eleven-month period ending August 31, 1977, MLS listings accounted for the sale of over 9,000 homes, with sales prices totalling in excess of $400 million.

From the inception of this lawsuit, MLS has maintained that it functions solely as a clearinghouse for information regarding residential properties listed with participating brokers, and that it is not otherwise involved with real estate transactions or sales activities within its jurisdiction. Plaintiffs, however, contend that MLS is more than an information exchange. Pointing to provisions in the MLS charter, by-laws, and rules and regulations, they argue that MLS exerts sufficient control over the sales practices of participating brokers to be held accountable, under Title VIII, for their acts of racial steering. Plaintiffs argue from a number of fronts that MLS is liable, both directly and vicariously, for the alleged racially discriminatory activities of the other defendants in this action, who make use of MLS listings in conducting their businesses. For the rea-

sons which follow, this court holds that there is no genuine dispute as to any material fact and that defendant MLS is entitled to judgment dismissing the complaint against it. Rule 56, F.R.Civ.P.

MLS claims no share of the commissions earned on sales of listed properties. Its substantial revenues—over $800,000 in fiscal year 1976–1977—derive solely from initiation and listing fees, dues, and charges for extra copies of daily listings ordered by participants. As noted above, listings submitted to MLS remain the property of the listing brokers, and it is left to the listing broker to set the commission split for sales effected through the MLS system. Furthermore, the rules MLS has adopted with respect to the use of information disseminated by the service are generally concerned with preserving the rights of the parties involved—that is, seller, listing broker, and selling broker, or with making the services it offers more attractive to eligible brokers.

Plaintiffs, however, insist that those provisions which relate to conduct of participating brokers indicate that MLS "controls" their selling practices. None of these provisions, however, is inconsistent with MLS's contention that it functions as an information exchange. It is evident that without rules of this kind, the ability of MLS to achieve its professed objective—to provide an efficient medium for the marketing of residential properties listed with participating brokers—would be seriously impaired. Plaintiffs allege no facts which contradict the purposes set forth in the Preamble to the MLS "Rules and Regulations":

"Multiple Listing is meant to provide a means for Realtors to give maximum service to the buying and selling public, and through this cooperative effort to serve their community best. The Multiple Listing Service is not itself a selling organization, but endeavors to make real estate more readily marketable by establishing a centralized source of market data as well as enabling a cooperative effort in selling which of necessity requires participants to adhere to publicly announced standards of real estate practice."

Plaintiffs' first line of attack is their most direct, and perhaps least tenable. Noting that Title VIII is to be liberally construed, see *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1971), and that it is to be read as barring "all forms of discrimination, sophisticated as well as simple-minded," *Williams v. Matthews Co.,* 499 F.2d 819, 826 (8 Cir. 1974), plaintiffs contend that in order to prevail, they need only show that "MLS's actions have a discriminatory effect or discriminatory consequence." Plaintiffs' Memorandum in Opposition at 16. Even assuming this to be a correct statement of the law,[2] plaintiffs point to no facts which would support the existence of a causal nexus between the way in which MLS obtains and disseminates listing information and the alleged steering activities of the other defendants in this action.

While it is true that the multiple listing concept is conceivably susceptible to abuses which may in some instances make it easier for unethical brokers to perpetuate

2. Compare *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7 Cir. 1977), where the Seventh Circuit concluded that although a showing of discriminatory intent is not required to establish a violation of § 3604(a), mere proof of discriminatory effect may not be sufficient. The court identified four factors material to determining whether § 3604(a) has been violated, once a showing of discriminatory impact has been made, and these factors appear equally applicable to § 3604(b):

"(1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis,* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." 558 F.2d at 1290.

or exploit segregated housing patterns, we think it equally true that the concept can be an effective tool for promoting integrated housing by providing a means of widely circulating home listings. Accordingly, plaintiffs' attempt to predicate liability on an *a priori* showing of discriminatory impact really proceeds on little more than a *sine qua non* or "but for" theory of causation. "An action brought under statutes forbidding racial discrimination is fundamentally for the redress of a tort," *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1143 (4 Cir. 1975), citing *Curtis v. Loether,* 415 U.S. 189, 195, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), and a mere showing that an injury would not have occurred but for the conduct complained of is never alone a sufficient basis for liability in tort. See *Prosser, Torts,* § 41 at 236–41 (4th Ed. 1971).

Plaintiffs' more serious contention is that MLS has failed to perform affirmative duties it bears both because of its role in the real estate market and because of the nature of its relationship with participating brokers. Plaintiffs are here at least on firmer ground, for it is conceded by MLS that several of the properties it listed were the subject of alleged acts of racial steering in the Wheatley Heights area. Nonetheless, the facts offered by plaintiffs to support this aspect of their claim are insufficient to hold MLS liable under Title VIII.

█ Plaintiffs here argue for a two-pronged theory of vicarious liability under the Fair Housing Act. The first component of their argument proceeds on the notion that the quantum of control MLS exercises over participant brokers is adequate to hold MLS liable for discriminatory acts of these brokers under the doctrine of *respondeat superior.* Plaintiffs rely on a series of Title VIII cases which have held principals and employers liable for the racially discriminatory practices of their agents and employees. See *Marr v. Rife,* 503 F.2d 735 (6 Cir. 1974); *United States v. Reddoch,* P.H.E.O.H. Rptr. ¶ 13569 (S.D.Ala.), *aff'd,* 467

F.2d 897 (5 Cir. 1972); *Moore v. Townsend,* 525 F.2d 482 (7 Cir. 1975); *Collins v. Spasojcevic,* P.H.E.O.H. Rptr. ¶ 13654 (N.D.Ill. 1974). See also *United States v. Real Estate Development Corp.,* 347 F.Supp. 776 (N.D.Miss.1972). Each of these cases addressed a situation in which there existed between the defendant and the person who had actively engaged in the discriminatory practice the kind of relationship that has traditionally supported vicarious liability. On the uncontroverted facts here presented, it is clear that participating brokers do not act on behalf, at the behest, or for the benefit of MLS. Such control as MLS does exercise is exercised not with respect to the sales activities of participants, but rather is directed at the *terms* upon which the services provided by MLS will be made available to qualified brokers.

The second theory of vicarious liability offered by plaintiffs relies on language in *United States v. Youritan,* 370 F.Supp. 643 (N.D.Cal.1973), where the district court held the owner and operator of eleven apartment buildings liable for the discriminatory practices of its building managers and rental agents. Although *respondeat superior* provided an adequate basis for defendant's liability, the court found additional support in its view that the duties imposed by Title VIII are "non-delegable." 370 F.Supp. at 649. Application of this concept is somewhat strained on the facts of this case, however, since *Youritan* involved a situation where a *principal* failed "to exercise sufficient control over agents, with the effect that housing was made unavailable because of race." *Id.* at 651. In *Youritan,* the defendant was himself subject to a duty, under § 3604, to make his apartments available to the public on a nondiscriminatory basis; the court held that his "perfunctory instructions" to his agents to comply with legal requirements were insufficient to discharge that duty. It is evident that here MLS is not a principal and has not been shown to have violated an express statutory duty.[3]

---

3. The court finds equally unmeritorious plaintiffs' contention that § 3604(c) "prohibits the

printing or publishing of any statement, advertisement or notice which *facilitates* a discrimi-

Plaintiffs have also invoked 42 U.S.C. §§ 1981 and 1982 in support of their claims. These statutes do not, in our view, support the broad theory of liability asserted by plaintiffs.

■ Sections 1981 and 1982 jointly derive from § 1 of the Civil Rights Act of 1866, supplemented and re-enacted by §§ 16 and 18 of the Enforcement Act of 1870, and were codified into their present form in §§ 1977 and 1978 of the Revised Statutes of 1874. For nearly a century, the application of the prohibitions of §§ 1981 and 1982 to private acts of discrimination was ignored. During the past decade, however, the Supreme Court has recognized that § 1 of the 1866 Act "was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein . . . ." *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189 (1968). See *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Tillman v. Wheaton-Haven Recreation Association,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). Although these decisions have treated §§ 1981 and 1982 as complementary to the civil rights legislation of the 1960's and reflect an unmistakable trend toward extending the reach of §§ 1981 and 1982 to racially discriminatory conduct beyond the scope of these more recent enactments, see *Runyon v. McCrary, supra,* and *Jones v. Alfred H. Mayer Co., supra,* plaintiffs have failed to cite and this court is not aware of any authority for the contention that either section provides a basis for the theory of liability here proposed.

■ Of the two statutory derivatives of § 1 of the 1866 Civil Rights Act, § 1982 is clearly more pertinent to the facts and allegations of this case. In *Jones, supra,* the Supreme Court held that § 1982 prohibits private, as well as public, racial discrimination in the sale and rental of real property. The Court observed, however, that:

"Whatever else it may be, 42 U.S.C. § 1982 is not a comprehensive open housing law. In sharp contrast to the Fair Housing Title (Title VIII) of the Civil Rights Act of 1968, . . . the statute in this case deals only with racial discrimination . . . . It does not deal specifically with discrimination in the provision of services or facilities in connection with the sale or rental of a dwelling. It does not prohibit advertising or other representations that indicate discriminatory preferences. It does not refer explicitly to discrimination in financing arrangements or in the provision of brokerage services." 392 U.S. at 413–14, 88 S.Ct. at 2189 (citations and footnotes omitted).

Moreover, the Court noted that although the enactment of Title VIII did not affect the scope of § 1982, it did underscore

"the vast difference between, on the one hand, a general statute applicable only to racial discrimination in the rental and sale of property and enforceable only by private parties acting on their own initiative, and, on the other hand, a detailed housing law, applicable to a broad range of discriminatory practices and enforceable by a complete arsenal of federal authority." *Id.* at 416–17, 88 S.Ct. at 2191.

With respect to the facts of this case, then, it is clear that the prohibitions of § 1982 are

---

natory sale . . . ." Plaintiffs' Memorandum in Opposition (9/30/77), at 20 (emphasis supplied). Although defendant's listings undoubtedly fall within the statute's coverage, it is clear that they do not indicate "any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limi-

tation, or discrimination." Thus, while § 3604(c) may indeed impose a duty upon MLS to refrain from publishing prohibited notices, see *Mayers v. Ridley,* 151 U.S.App.D.C. 45, 465 F.2d 630 (1972), there is no authority for plaintiffs' contention that this provision requires MLS to prevent misuses of otherwise unobjectionable listings.

at best duplicative of those found in Title VIII. Similarly, § 1981's proscription of racial discrimination in the making and enforcement of private contracts, although applicable in a broad variety of contexts,[4] and arguably relevant to contracts for real estate brokerage services, does not add materially to the more specific provisions of Title VIII, particularly 42 U.S.C. §§ 3604(b) and 3606.[5]

On the undisputed factual allegations offered by plaintiffs in opposition to this motion, it is apparent that MLS is entitled, as a matter of law, to judgment in its favor dismissing the complaint as against it. Accordingly, the motion of MLS for summary judgment is granted.

SO ORDERED.

See also D.C., 415 F.Supp. 544.

---

4. See *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (discrimination in admission to private schools); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 160, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), and *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (employment discrimination); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973) (membership in private swimming pool association); *United States v. Medical Society,* 298 F.Supp. 145 (D.S.C.1969). See generally, Note,

*The Expanding Scope of Section 1981: Assault on Private Discrimination and a Cloud on Affirmative Action,* 90 Harv.L.Rev. 412 (1976); Note, *Federal Power to Regulate Private Discrimination: the Revival of the Enforcement Clauses of the Reconstruction Era Amendments,* 74 Colum.L.Rev. 449, 477 *et seq.* (1974).

5. It is, therefore, unnecessary to reach the question, previously reserved, of plaintiffs' standing to sue under 42 U.S.C. §§ 1981 and 1982.