**UNITED STATES of America**

**v.**

**Raymond C. MITCHELL, d/b/a Ray Mitchell Realty Company.**

**UNITED STATES of America**

**v.**

**BOB LAWRENCE REALTY, INC., et al.**

**Civ. A. Nos. 13467, 13468.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Dec. 27, 1971.

John N. Mitchell, Atty. Gen., Jerris Leonard, Asst. Atty. Gen., Frank E. Schwelb, Thomas M. Keeling, Carl A. Gabel, Attys., Department of Justice, Washington, D. C., John W. Stokes, Jr., U. S. Atty., N. D. Ga., Atlanta, Ga., for plaintiff.

Hugh M. Dorsey, Jr., Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for Ray Mitchell.

Glenville Haldi, Peek, Whaley & Haldi, Atlanta, Ga., for Lawrence.

Charles L. Weltner, Weltner & Crumbley, Atlanta, Ga., for Stanley.

## ORDER

EDENFIELD, District Judge.

In these "blockbusting" suits in each of which motions for complete summary judgment have previously been denied,[1] the Attorney General originally sought injunctive relief against six Atlanta real estate firms for allegedly engaging, for profit, in a pattern or practice of inducing or attempting to induce persons to sell or rent their homes by representations regarding the entry or prospective entry into the neighborhoods of persons of a particular race, color, religion or national origin, in violation of the Fair Housing Act of 1968, sections 3604 and 3613 of Title 42 of the United States Code. As part of such actions the government also claimed that the defendants had deprived a group of persons of their rights as guaranteed by that Act. Three of the cases were disposed of by consent before trial and the three remaining cases were tried before the court without a jury on October 4 through 14, 1971.

All of the defendants are real estate brokers licensed by the State of Georgia to engage in the listing and selling of real estate. Each is the sole proprietor of the company bearing his (or her) name.

Defendant Mitchell employs approximately 80 sales persons or agents, about one-half of whom are part-time, the others being regular full-time employees. Defendant Stanley employs 14 agents and Lawrence 27. Each defendant, through its sales people, acts as agent for listing sellers and presents offers (contracts) on behalf of potential buyers, earning commissions from the sellers only when sales are consummated. Almost all such sales involve single-family dwellings. All of the defendants and all agents are white.

The earnings of real estate salesmen are derived from the commissions earned on houses they sell and from no other source. A salesman's earnings increase in direct proportion to the increase in the number of houses he or she sells.

The Mitchell case involves four areas in Southwest Atlanta known as Heritage Valley, Dixie Pines, Kings Forest, and an area between Campbellton and Beecher Roads. These areas comprise altogether a total of four square miles. The cases against Stanley and Lawrence involve an area in Southeast Atlanta known as the Candler Road-Glenwood-McAfee area.

These areas have been since 1968 considered racially transitional; that is, prior to 1968 the racial occupancy of them was all white, but beginning in 1968 as blacks began moving in whites began moving out. All of the areas are now substantially all black. All of the defendants were aware of this transition.

Virtually all of the testimony in each case came either from housewives now or formerly living in the affected areas or from the defendants and agents themselves.

The evidence at the trial disclosed many illuminating things about what happens in a residential neighborhood when it becomes racially transitional. For example, if these cases are typical —and the court believes they are—the following consequences can be predicted

1. United States v. Mitchell, D.C., 327 F.Supp. 476 and United States v. Lawrence, D.C., 327 F.Supp. 487.

as inevitable, and beyond dispute: First, a sense of panic and urgency immediately grips the neighborhood and rumors circulate and recirculate about the extent of the intrusion (real or fancied), the effect on property values and the quality of education. Second, there are sales and rumors of sales, some true, some false. Third, the frenzied listing and sale of houses attracts real estate agents like flies to a leaking jug of honey. Fourth, even those owners who do not sell are sorely tempted as their neighbors move away, and hence those who remain are peculiarly vulnerable. Fifth, the names of successful agents are exchanged and recommended between homeowners and frequently the agents are called by the owners themselves, if not to make a listing then at least to get an up-to-date appraisal. Constant solicitation of listings goes on by all agents either by house-to-house calls and/or by mail and/or by telephone, to the point where owners and residents are driven almost to distraction.

In this maelstrom the atmosphere is necessarily charged with Race, whether mentioned or not, and as a result there is very little cause or necessity for an agent to make direct representations as to race or as to what is going on. On the contrary both sides already know, all too well, what is going on. In short, for an agent to get a listing or make a sale *because* of racial tensions in such an area is relatively easy, whereas the direct *mention* of race in making the sale is superfluous and wholly unnecessary.

It is perhaps for this reason that the evidence here as to direct racial representations by the individual agent is skimpy indeed and is, in the view of the court, insufficient to establish an individual "pattern or practice" on the part of any one of the defendants.

At the same time what the evidence does establish, by overwhelming preponderance, is a "group" pattern or practice by all agents in the area, both defendants and non-defendants, and that some agent or agents of each of the defendants did knowingly participate in such pattern or practice, at least in some measure or to some degree.[2]

The court is further of the opinion that the foregoing finding establishes the necessary "concert" of action to allow the Attorney General to bring this suit and entitles him to an injunction requiring that, in the future, the defendants obey the law.

This would normally dispose of these cases, but in fairness to the defendants and in amelioration of the injunction to be entered the court cannot omit an observation that in at least some instances the agents were more sinned against than sinning. There is clear evidence, for example, that in at least one instance a complaining witness who had listed her house with an agent of one defendant, and who had recommended to other neighbors that they do likewise, became disenchanted with the agent primarily because a black purchaser whom the agent had produced reneged on his purchase contract. She freely admitted from the stand that because of this when the present investigation started she came forward as a witness as to statutory violations solely to "get" the real estate license of one of the defendants if she could do so.

At least two other government witnesses testified to their affiliation with a civic group first known as the "Neighborhood Stabilization Committee" and

---

2. For example: As to defendant Ray Mitchell, prohibited representations were made to Mrs. McCrimmon by agents Wofford and Rick (though both of these agents were either fired by this defendant or resigned long before these suits were filed); to Mrs. Turner and Mr. King by agent Cook; and to Mrs. Galloway by agent McDougall.

As to defendant Stanley, prohibited representations were made to Mrs. Hadley by agent Garner and to homeowner Rodgers by agent Rogers.

As to defendant Lawrence, prohibited representations were made to Mrs. Wilmer, Mrs. McCrum, Mrs. Brown and Mrs. Crews by agents Hammond and Murrison.

later as "South DeKalb Neighbors". Its object was to stabilize the neighborhood. Meetings were held weekly. One of these witnesses took an examination and became an agent herself simply to find out what could be done under the law. She was thoroughly familiar with the Fair Housing Act and its sanctions. She was party to a number of actions aimed at one of the defendant companies and others operating in the area. For example, on one occasion she put a sign in her yard saying, "Warning—Real Estate Agents shot on Sight." On another occasion, as president of her local group, one of these witnesses attended a convention of a national neighborhood group in Dayton, Ohio, and brought home circulars advising homeowners to "encourage agents to make racial representations" in violation of the Act and to "lead the agents on" until a violation of the Act was established. Some 4,000 of these circulars were distributed in her neighborhood.

It also appears that of the defendants' agents making racial representations at least two had been discharged by defendants, for one cause or another, long before these suits were filed.

There was also evidence, undisputed in the record, that two of the three defendants remaining in the cases held meetings with their agents on a daily or weekly basis at which the appropriate sections of the Fair Housing Act were read and discussed and the agents admonished to observe its provisions.

Considering these circumstances and the scantiness of the direct evidence the court must say that it is not overly impressed with the gravity of the individual transgressions of the individual defendants and their agents. It *is* convinced, however, that by a group pattern or practice the neighborhoods involved were, because of the racial transition thereof, harassed almost beyond endurance and that each of the defendants in some measure participated therein. They should therefore be enjoined.

It is therefore considered, ordered and adjudged:

(1) That the defendants and their agents, employees, successors, and all those acting in concert or participation with them, be and they are hereby permanently enjoined from inducing or attempting to induce any person to sell or rent any dwelling by any explicit or implicit representations regarding the entry into the neighborhood of a person or persons of a particular race, color, religion, or national origin;

(2) a. That the defendants shall instruct each salesman, agent, and employee of the provisions of the Fair Housing Act and of this decree, his obligations and duties thereunder, and that failure to comply with these obligations and duties may result in dismissal or other appropriate action. This instruction shall be given within ten (10) days of the entry of this decree, and thereafter within ten (10) days of hiring of any new salesmen, employees, and agents. The defendants shall secure from each salesman, employee, and agent a signed statement certifying that he understands his obligations and duties not to discriminate against any person on account of race, color, religion, or national origin in relation to the sale or rental of dwellings, or the employment of personnel;

b. That the defendants shall conduct all solicitation effort in such a manner so that the types and amount of solicitation activity shall be essentially similar in all areas in which the defendants conduct business and the defendants shall not conduct a greater amount or a different type of solicitation in areas which are inhabited by Negroes, or partially inhabited by Negroes, than in areas which are not so inhabited;

c. That the defendants shall make a notation on their records to indicate the race of each person who purchases a house, or sells a house, in the course of their business;

d. That the defendants in all of their real estate transactions, shall provide their services without distinctions based on race or color;

**1008**

(3) That in case of a dispute as to any future charge by plaintiff that this order has been violated by defendants, either individually or jointly, the parties, in an attempt to resolve such dispute, shall attempt to conciliate the matter which is the subject of the allegation within 30 days after the other party has been notified of the alleged violation, and a party shall not apply to this court for additional relief or other appropriate relief within such 30-day period, provided that nothing shall prevent a party from applying to the court in the event that the alleged violation is an explicit violation of the order, as found by the court, and the utilization of the procedure described above would result in irreparable injury to the victim of the alleged discrimination; and

(4) That this order shall be effective for a period of two years from this date, provided, however, that for good cause shown, the parties may move this court for an extension or modification of the order, as appropriate, upon giving the other party 30 days notice prior to moving for such modification or extension.

Representatives of the plaintiff shall be permitted to inspect and copy all pertinent records of the defendants at any and all reasonable times, provided, however, that the plaintiff shall endeavor to minimize any inconvenience to the defendants from the inspection of such records.

In view of the foregoing injunction no ruling is made on the government's further contention that a group of persons has been denied rights under the Act, first because the evidence here, in the view of the court, is not sufficient to raise an issue of general public importance as required by 42 U.S.C.A. § 3613, and second, because the individuals affected are each assured of a remedy under 42 U.S.C.A. § 3612 in any event.

The court retains jurisdiction of this action for all purposes.

It is so ordered.