**UNITED STATES of America, Plaintiff,**

v.

**YOURITAN CONSTRUCTION COMPANY, a corporation, et al., Defendants.**

**No. C 71 1163 ACW.**

United States District Court, N. D. California.

Feb. 8, 1973.

James L. Browning, Jr., U. S. Atty., David Bancroft, Asst. U. S. Atty., San Francisco, Cal., Elliott McCarthy, Dept. of Justice, Housing Section, Washington, D. C., for plaintiff.

Gerald B. Ferrari, Palo Alto, Cal., Bressani, Hansen & Blos, San Jose, Cal., for defendants.

Richard G. Mansfield, Palo Alto, Cal., for Midpeninsula Citizens for Fair Housing.

## FINDINGS OF FACT, CONCLUSION OF LAW, AND JUDGMENT

WOLLENBERG, District Judge.

### INTRODUCTORY STATEMENT

The United States instituted this action on June 16, 1971, pursuant to Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq., alleging that (1) the defendants have engaged in conduct constituting a pattern or practice of resistance to the enjoyment of rights secured by 42 U.S.C. § 3604 and that (2) the defendants have denied a group of persons rights granted by Title VIII, which denial raised an issue of general public importance. The Government's complaint prays for injunctive and affirmative relief. In their answer, the defendants denied the material allegations of the complaint. Trial was held on July 17–21 and July 31–August 3, 1972. On the basis of the evidence adduced at trial, and pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court now makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

*The Defendants*

1. The defendant Tan Construction Company is owned and operated by the defendant T. S. Tan (hereinafter "Tan"

or defendants). Tan operates and owns in whole or in part 11 apartment buildings in and near the City of Palo Alto, California containing 1133 rental units.[1] The first of these buildings began operations in 1959 and others have been opened at various times since then.

2. The rental of the apartments ranges from $120 per month for an unfurnished one-bedroom apartment to far higher amounts for larger and more luxurious units. At the time of the filing of this action, six of Tan's buildings had no black occupants and had never had any. One of those six was the Americana, which opened in October 1969 with 286 units and by the time of the suit had 486 units available for occupancy (though other parts of the complex were in various stages of construction). As of June 1971, when this action was filed, Tan's other five buildings contained 14 units occupied by black persons, these units representing 1.2% of the 1133 in all of Tan's buildings. However, 11 of the above 14 units were located in three buildings (two large and one small) near East Palo Alto which contains the only concentrated black residential area in the locality served by Tan's buildings.

3. Each of defendants' apartment buildings is operated by a resident manager, most of whom are helped out by relief managers on their days off. Two of the buildings have assistant managers (Americana and Tan Village.) The resident managers report to Tan's central office in Palo Alto and their immediate superior is Mr. Zee,[2] the defendants' general property manager. Mr. Zee has held this position since 1968. All of the resident managers and other persons employed to assist in the tenant application process have been white persons.

4. Mrs. Louise Boatwright was the resident manager at the defendants'

Americana complex between October 1969 and April 1971. Previously she had held this position at Sunshine Gardens from October 1965 to March 1966, at Tan Manor from March 1966 to October 1969 and at Tan Village from May 1971 to September 1971. Mrs. Boatwright was initially hired by Mr. Tan. Unlike the rest of defendants' apartment complexes the Americana employs "rental agents" who work under the supervision of the resident manager and whose job is to show prospective tenants around the complex and present those interested in applications to the resident manager for processing.

5. At the trial, four of Tan's former employees who had worked at the Americana complex during the time Mrs. Boatwright was the resident manager, testified that Mrs. Boatwright had instructed them to discriminate against black persons and members of other minority groups in the rental of apartments at the complex, and had made a number of statements indicating that it was defendants' policy and disposition to avoid renting to black tenants.

6. Mrs. Boatwright suggested, and the rental agents carried out, several methods of discouraging minority applicants. These methods included showing applicants the most expensive apartments, giving them incomplete tours of the Americana complex, and misrepresenting the availability of apartments. In addition, rental agents were instructed to emphasize the security deposit requirements, and to inform applicants that two week credit checks would be required before renting. These instructions were enforced by telling rental agents they would not receive a commission for renting to a black or other minority person.

1. Information relative to the name, location and number of units at each apartment complex, the types of bedroom accommodations, rental price range and security deposit requirements, when the buildings began operation, the number of blacks at the building at the time of suit and where applicable, the date of the first black tenant at the building, is set forth in Appendix "A" to these findings.

2. Mr. Tan retained his supervisory responsibility over the resident manager of the Americana (See testimony of Mr. Zee.)

7. Although there is some disagreement among the four former employees called by the Government as to precise details of their experiences, their testimony is supported by the complete absence of black tenants at the Americana during the time in question, by the testimony of other witnesses who had rental, experiences with defendants which conformed to the methods suggested by Mrs. Boatwright for implementing defendants' discriminatory policy, and by the Court's observation of the demeanor and credibility of all the witnesses.

8. Several of the Government's witnesses stated that Mrs. Boatwright attributed her discriminatory instructions to her supervisors, Mr. Tan and Mr. Zee, who in turn denied giving such instructions to Mrs. Boatwright. For reasons set forth in Conclusion of Law No. 6, *infra,* it is not necessary for the Court to resolve this conflict. Mrs. Boatwright's behavior resulted from defendants' failure, by design or by thoughtlessness, to supervise Mrs. Boatwright and their failure to provide an objective, reviewable application procedure that would prevent black applicants from being subjected to their agents' racially discriminatory preferences.

9. Accordingly, the Court finds that Mrs. Boatwright during the course of her employment, gave discriminatory instructions to rental agents working under her at the Americana Apartments and that these instructions were on various occasions implemented by rental agents, resulting in the denial of apartments to blacks because of race.

10. In addition to the testimony regarding the discriminatory instructions given by the resident manager of the Americana to her subordinates, the United States introduced evidence of discriminatory treatment of blacks at other of defendants' apartment complexes. A considerable proportion of this evidence consisted of the testimony of black and white "testers"[3] who visited various of defendants' buildings to inquire about the availability of apartments for rent. The testers' method was to have a black applicant and a white applicant usually of the same age and sex, make similar inquiry at an apartment on the same day within minutes of each other.

11. The experiences to which the "testers" testified fall into two main categories: first, whites asked if a credit check was necessary and were told that it was not, and that they could move in immediately or within a few days, while blacks were told that a credit check was necessary and it would take a period of time ranging from a few days to a week; second, black applicants were told that no apartments were available while white applicants on virtually contemporaneous occasions were advised that apartments were available.[4]

12. The testimony of black and white testers was highly credible on its face. Moreover, the substance of their testimony was substantially corroborated by defendants' records on apartment vacancy and availability, by the testimony of Tan's former employees, and by the testimony of *bona fide* black applicants at Tan's buildings.

13. The pattern of telling blacks that no apartments were available was not uniform; a handful of blacks had been accepted at defendants' buildings at the time of suit and some black testers were told apartments were available.[5] The

3. These testers operated under the auspices of two "fair housing" groups—one the Mid-Peninsula Citizens For Fair Housing and the other an informal group at the Stanford Business School. The purpose of these groups was to ascertain whether persons operating various apartments were treating black and white applicants alike. Their activities are a reasonable means by which citizens may ascertain the compliance status of landlords with fair housing laws and evidence of their activities is an appropriate method of demonstrating the policies and practices of a particular landlord in a proceeding of this nature. See Conclusion of Law No. 11, *infra.*

4. The credit check and availability experiences are summarized in Appendix "B".

5. See Appendix "B".

Court finds, however, that on a substantial and significant number of occasions, defendants' agents falsely represented to black rental applicants that apartments were not available, and that they used the "credit check" device to discourage blacks from renting. The Court finds that this racially discriminatory conduct occurred because the owners and their top assistants failed to take aggressive action to insure that agents dealing with applicants treated everyone alike without regard to race or color.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under 28 U.S.C. § 1345 and 42 U.S.C. § 3613.

2. The apartment buildings described in Finding of Fact No. 1 are "dwellings within the meaning of 42 U.S.C. 3602(b)."

■ 3. Title VIII of the Civil Rights Act of 1968 (42 U.S.C. § 3601 et seq.) is an appropriate and constitutionally permissible exercise of Congressional power under the Thirteenth Amendment to bar· all racial discrimination, private as well as public, in the sale and rental of real property. United States v. Hunter, 459 F.2d 205 (4th Cir. 1972), cert. den., 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189, aff'g 324 F.Supp. 529 (D. Md.1971); United States v. Real Estate Development Corp., 347 F.Supp. 776, (N.D.Miss.1972); United States v. Reddoch (No. 6541–71–P, S.D.Ala., January 27, 1972), aff'd, 467 F.2d 897 (5th Cir. 1972); Brown v. State Realty, 304 F. Supp. 1236 (N.D.Ga.1969); United States v. Mintzes, 304 F.Supp. 1305 (D. Md.1969).

■ 4. In weighing the evidence in this case, the court recognizes that the law prohibits "sophisticated as well as simple-minded modes of discrimination." United States v. Real Estate Development Corp., supra; Lane v. Wilson, 307 U.S. 268 at 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939); Gaston County v. United States, 288 F.Supp. 678 (D.D.C.1968), aff'd 395 U.S. 285, 89 S.Ct. 1720, 23 L.

Ed.2d 309 (1969). Racially derogatory remarks, by those in a position to influence the attitude of fellow and subordinate employees toward apartment applicants of a particular race, can reasonably be expected to adversely affect the rental opportunities of applicants. Thus, laws prohibiting discrimination in housing because of race prohibit not only, for example, overt racial rejection of applicants, but subtle behavior as well. United States v. Mitchell, 327 F. Supp. 476 (N.D.Ga.1971) (reasonable man standard applied to "subtle" statements in fair housing case).

■■ 5. Section 804(a) of the 1968 Fair Housing Act (42 U.S.C. § 3604(a)), in addition to specifying that it shall be unlawful to refuse to rent or to refuse to negotiate for the rental of housing because of race, also makes it unlawful to "otherwise make unavailable" housing, or to deny housing because of race. The foregoing phraseology appears to be as broad as Congress could have made it, and all practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful. United States v. Real Estate Development Corp., supra; United States v. Grooms, 348 F.Supp. 1130 (M.D.Fla. 1972). The imposition of more burdensome application procedures, of delaying tactics, and of various forms of discouragement by resident managers and rental agents constitutes a violation of Section 3604(a) not only by those who impose these procedural roadblocks, Hall v. Freitas, 343 F.Supp. 1099, 1101 (N.D. Cal.1972); Stearns v. Fair Employment Practice Commission, 6 Cal.3d 205, 98 Cal.Rptr. 467, 490 P.2d 857 (1971), but also by top management and owners who fail to set forth objective and reviewable procedures for apartment application and rental. Failure to provide a black applicant with necessary and correct information concerning what he must do to become a tenant discourages and impedes his application and results in his exclusion from the apartments because of race. United States v. West Peachtree Tenth Corp., 437 F.2d 221

(5th Cir. 1971); United States v. Reddoch, *supra,* slip opinion at p. 24.

6. The discriminatory conduct of an apartment manager or rental agent is, as a general rule, attributable to the owner and property manager of the apartment complex, both under the doctrine of *respondeat superior* and because the duty to obey the law is non-delegable. United States v. Real Estate Development Corp., *supra*; United States v. Reddoch, *supra*; Williamson v. Hampton Mgt. Co., 339 F.Supp. 1146 (N.D.Ill.1972); and United States v. Mitchell, 335 F.Supp. 1004, 1006 (N.D.Ga.1971). As the court stated in United States v. Real Estate Development Corp., *supra,* 347 F.Supp. at 785 (apartment case):

> The resident managers and managers of the defendants, as agents of the defendants, are authorized to represent the defendants and can rent in no other capacity. Their acts and statements, made within the scope of their agency, are attributable to the defendants, whose duty to comply with the law is non-delegable. United States v. Reddoch, *supra,* slip opinion at 28; Williamson v. Hampton Mgt. Co., 339 F.Supp. 1146 (N.D.Ill.1972).

Owners and supervisors are responsible for the conduct of their agents; an injunction has been issued against principals for the unlawful conduct of their agents even where they instructed them to obey the law at regular staff meetings. United States v. Mitchell, 335 F.Supp. 1004 (N.D.Ga.1971). Accordingly, where, as here, management's lack of supervision and failure to establish objective and reviewable procedural standards have resulted in apartments being made unavailable to blacks by agents and employees, management's failure to act is in itself violative of Section 3604(a).

7. As the court said in United States v. Reddoch, *supra,* at 22–23, another apartment discrimination case:

> "in the problem of racial discrimination, statistics often tell much, and Courts listen." State of Alabama v. United States, 304 F.2d 583 (5th Cir. 1962) aff'd 371 U.S. 37 [83 S.Ct. 145, 9 L.Ed.2d 112] (1962). "Nothing is as emphatic as zero." United States v. Hinds County Board of Education, 417 F.2d 852 at 858 (5th Cir. 1969).

Accord: Newbern v. Lake Lorelei, Inc., 308 F.Supp. 407, 417 (S.D.Ohio 1968) (housing); United States v. Real Estate Development Corp., *supra.* In the present case, six of defendants' eleven apartment buildings, containing 752 (roughly ⅔) of its 1133 rental units, have been in continuous operation from various opening dates ranging from March 1961 to February 1970, and none had a black tenant prior to the filing of the instant suit in June 1971. Moreover, defendants acknowledge that no black person has ever resided at four of these six buildings. The remaining five apartment buildings have been in operation for varying time periods ranging from 3 to 13 years, but none had a black tenant until December 1967, when the first black tenant moved into Tan House. At the time of suit only 14 of defendants' 1133 units (or 1.2%) were occupied by blacks. This evidence constitutes, at least a *prima facie* case of racial discrimination, casting a burden upon the defendant to come forward with evidence to the contrary. United States v. Real Estate Development Corp., *supra*; United States v. Reddoch, *supra*; Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 at 426 (8th Cir. 1970); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 at 247, 248 (10th Cir. 1970), cert. den., 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971).

8. The legal effect of the foregoing statistical evidence is reinforced by the absence of an objective and uniform rental application procedure. Just as vague and undefined employment standards which result in whites, but not blacks, being hired are unlawfully discriminatory, so too are arbitrary and uncontrolled apartment rental procedures which produce otherwise unex-

plained racially discriminatory results. See Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377 at 1383 (4th Cir. 1972), cert. den. 409 U.S. 982, 93 S. Ct. 319, 34 L.Ed.2d 246 (employment).

9. The statistics set forth in paragraph 7 raise the inference that the arbitrary procedural roadblocks placed in the path of black rental applicants were put there because of race, and not neutral thoughtlessness.

10. Defendants have instructed their apartment managers to seek prospective tenants who fit in with present tenants. Prospective compatibility with other tenants is not an appropriate rental consideration where its application would have a discriminatory racial impact. See Conclusion of Law No. 7 in United States v. Reddoch, *supra.* In apartment rental cases, a compatibility standard should be carefully scrutinized when some of defendants' complexes have no black tenants and the few blacks renting from defendants are concentrated in complexes located near a black residential area.

11. Evidence of the experiences of white and black "testers" or "checkers" has been uniformly admitted into evidence to show the existence of a discriminatory policy. Evers v. Dwyer, 358 U. S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958) (buses); Pierson v. Ray, 386 U. S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (bus terminals); Newbern v Lake Lorelei, Inc., *supra* (housing); Harris v. Jones, 296 F.Supp. 1082 (D. Mass.1969) (housing); Brown v. Dallas, 331 F.Supp. 1033 (N.D.Tex.1971) (housing); Williamson v. Hampton Management Co., *supra* at p. 1148 of 339 F. Supp. (housing); Seaton v. Sky Realty Co., C.A.No.70–C–972 (N.D., Ill. June 25, 1972) (housing).

12. 42 U.S.C. § 3604(a) makes it unlawful to refuse to rent an apartment after the making of a bona fide offer, to refuse to negotiate for rental, and to otherwise make unavailable or deny an apartment, because of race. The sentence is so constructed that the "bona fide offer" requirement grammatically applies only to refusals to rent, and not to the remainder of the prohibition. Moreover, 42 U.S.C. § 3604(d) makes it unlawful to misrepresent the availability of an apartment because of race, and this section contains no requirement of a *bona fide* offer. Accordingly, the requirement of a *bona fide* victim is limited to discriminatory refusals to rent (or to sell, in the case of single family home), Dubose v. Gorey Realty Co., C.A.No.69–C–422 (N.D.Ill. June 17, 1969), and has no application to the other sections of the statute.

13. To prevail in this case under the provisions of 42 U.S.C. § 3613, the Attorney General must show either:

(a) a pattern or practice of resistance to the enjoyment of the right to equal housing opportunity;

*or*

(b) a denial of such rights to a group of persons, as to which denial the Attorney General has made a determination of general public importance.

United States v. Hunter, *supra;* United States v. Reddoch, *supra*; United States v. Real Estate Development Corp., *supra.*

14. Instructions by a resident manager to rental agents to discriminate in various ways against black and Mexican-American applicants are imputable to the defendants and constitute a discriminatory course of conduct, which satisfies the pattern or practice requirements of 42 U.S.C. § 3613. United States v. Reddoch, *supra*; United States v. West Peachtree Tenth Corp., *supra*; United States v. Alexander and Cloutier Realty Co., C.A.No.13805, *supra* (policy admissions). This is true both as to the direct instructions to discriminate, such as those given by Mrs. Boatwright to several employees, and as to statements and conduct which, while not specifically ordering discrimination, are reasonably calculated to cause subordinates to discriminate.

15. Even though specific acts of agents were in themselves violations of other sections of the Act (e. g. agents violated Section 3604(d) by telling black rental applicants that no apartments

were available when one in fact was available), the paramount concern of the Court in a pattern or practice case of this kind must be the underlying violation of Section 3604(a) by the principal—failure to exercise sufficient control over agents, with the effect that housing was made unavailable because of race. Principals who provide an atmosphere in which agents may and do, easily and without supervision or control, make housing unavailable because of race engage in a pattern or practice of discrimination even though no specific instructions were given to agents to do so and even though management gives perfunctory instructions to "treat everyone alike" without any effective effort to insure that the instructions are carried out.

16. The "second alternative" of 42 U.S.C. § 3613 authorizes injunctive relief in favor of the government where there has been a denial of rights granted by the Act to any group of persons and where the Attorney General had determined [6] that such denial raises an issue of general public importance. United States v. Reddoch, *supra;* United States v. Real Estate Development Corp., *supra;* United States v. Hunter, *supra.*

17. Injunctive relief is appropriate in this case on the sole basis of defendants' discriminatory treatment of blacks through their agents. Similarly, an injunction based on the extrajudicial admissions of a discriminatory policy and instructions to discriminate by defendants' agents, standing alone, is justified. The need for such relief is even more cogent when all of these kinds of evidence are considered together. United States v. Reddoch, *supra,* slip opinion at 27; United States v. Real Estate Development Corp., *supra,* 347 F.Supp. at 784.

18. Defendants claim that no injunctive relief is necessary in this case, as they claim to be ready to obey the law. The defendants' good faith, however, does not justify the withholding of injunctive relief where, as here, the statutory prerequisites for an injunction have been met. United States v. West Peachtree Tenth Corp., *supra;* United States v. Real Estate Development Corp., *supra.* In the present case, the active discrimination was done by agents of the defendants. If the defendants are enjoined, their agents will be subject to the provisions of the decree and liable for contempt if they violate it. There would, however, be no effective control of the agents' conduct if injunctive relief were withheld. Accordingly, the court will issue an injunction which, while keeping federal intrusion into defendants' business practices to the minimum required to assure equal housing opportunity, will at the same time be sufficiently comprehensive to assure compliance by all concerned. United States v. West Peachtree Tenth Corp., *supra,* 437 F.2d at 229 et seq.

19. Any of the foregoing Conclusions of Law which should more properly be denominated a Finding of Fact may be so considered.

## JUDGMENT

Pursuant to the foregoing Findings of Fact and Conclusions of Law, it is hereby Ordered, Adjudged and Decreed that the defendant Youritan Construction Company, dba Tan Construction Company, and its owners, officers, agents, employees, successors and all persons in active concern or participation with any of them, are permanently enjoined with respect to the operations of all apartment buildings owned, managed or controlled by them now or in the future from:

1. Making unavailable or denying any dwelling to any person on account of race, color or national origin.

---

6. In United States v. Real Estate Development Corp., *supra,* 347 F.Supp. at p. 784, the Court said:

As indicated in *Reddoch,* the Attorney General's determination of general public importance is not reviewable. See United States v. Mitchell, 313 F.Supp. 299 (N.D. Ga.1970); United States v. Greenwood Municipal Separate School District, 406 F.2d 1086 (5th Cir. 1970) (determination that suit will promote orderly school desegregation).

2. Discriminating against any person in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color or national origin.

3. Making, printing, or publishing, or causing to be made, printed, or published, any notice, statement, or advertisement, with respect to the rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, or national origin.

4. Representing to any person because of race, color, or national origin that any dwelling is not available for inspection or rental when such dwelling is in fact available.

5. Failing or refusing to hire, assign, promote or recruit any employee or prospective employee on account of race, color, religion or national origin, or engaging in any discriminatory employment practice within the meaning of 42 U.S.C. § 2000e et seq.

It is further Ordered that the defendants[7] shall forthwith adopt and implement an affirmative program of compliance with the provisions of the Fair Housing Act in order to insure that in the future all apartments will be available for inspection by and rental to black and other nonwhites on the same basis that they are made available for inspection by and rental to white persons. This program shall include the following:

A. The defendants shall, within 30 days of the entry of this Order, conduct an educational program for its rental personnel and other agents and employees to inform them of the provisions of this Order and their duties under the Fair Housing Act. Such program shall include the following:
1. A copy of this Order shall be furnished to each agent and employee.
2. By general meeting or individual conference, the defendants shall inform each agent and employee of the provisions of this Order and of the duties of the defendants and their agents and employees under the Fair Housing Act. Each agent and employee shall also be informed that his failure to comply with the provisions of this Order shall subject him to dismissal or other appropriate disciplinary action.

3. Each agent and employee shall sign a statement that he has read this Order and that he fully understands his responsibilities thereunder.

4. The above stated program shall be given within 15 days of the filing of this Order, and thereafter, upon the hiring of any new employee, within 5 days of the commencement of his duties.

B. The defendants shall inform the public generally and their customers and clients specifically of the defendants' nondiscriminatory policy by the following actions:

1. Each of defendants' application forms and lease agreements shall contain a prominent statement that apartments will be shown and made available for rental to all persons without regard to race, color, religion or national origin in compliance with the 1968 Fair Housing Act, 42 U.S.C. § 3604. In addition, at the time of application, prospective tenants of the defendant are to be orally informed of this provision and of the defendants' uniform rental application standards and procedures including financial requirements, credit checks, waiting periods, etc.

2. All advertising of apartments complexes owned or operated by defendants in newspapers or other media[8] including radio and TV and in billboards, pamphlets, brochures, handouts, and writings of any kind, shall include a statement prominently placed and easily legible to the effect that apartments are rented

---

7. This term includes Youritan Construction Company and all persons or other entities subject to this Order as described in the first paragraph of this Order.

8. In radio advertising, the equal opportunity statement shall be easily audible.

without regard to race, color, religion or national origin.

3. On the 1st and 15th day of each month, the defendants shall post and maintain (1) a list of actual and expected vacancies at all buildings in their central office at 3630 El Camino Real, Palo Alto, California, and (2) a list of actual vacancies at each individual apartment complex owned now or in the future by any defendant. at the rental office of such apartment complex.

4. Within thirty days of the entry of this Order, the defendants shall permanently post in a conspicuous location in the defendants' business office at 3630 El Camino Real, Palo Alto, California, or immediately outside the office, a notice or sign, clearly visible to prospective applicants, stating that defendant rents dwellings on a racially nondiscriminatory basis. In addition, the defendants shall place a "Fair Housing" notice or sign of the type described in the preceding sentence in a prominent place in the rental office or immediately outside the rental office of each apartment building which it owns or operates. All signs to be posted pursuant to this Order shall be in conformity with pertinent regulations of the Secretary of HUD, 37 F.R. 3429 et seq. A copy of said regulations is attached hereto as Appendix "C".

C. The defendants shall establish and implement uniform, objective and nondiscriminatory standards and procedures for the processing, evaluation and approval of applications, which shall insure that prospective tenants are accorded an informed choice of apartments at all of defendants' complexes. These standards and procedures shall not be more onerous or stringent than those heretofore applied to white applicants. Within 30 days of the entry of this Order, defendants shall file with the Court, with copies to plaintiff, the proposed standards and procedures. Plaintiff shall have twenty days from receipt of these standards and procedures to file objections with the Court. If plaintiff files no objection, and if the Court makes no contrary ruling *sua sponte*, these standards and procedures shall be adopted without further order of the Court.

If after the adoption and approval of objective standards and procedures, the defendants desire to alter them, they may do so, provided that any changes are objective, in writing, and non-racial in purpose and effect. If any such change is made within three years of the entry of this Order, it shall be filed with the Court, with copies to plaintiff, and any dispute arising from such proposed change may be raised by either party in any subsequent appropriate proceeding in this Court.

It is further Ordered that the defendants shall, for three years following the entry of this Order, make, keep and preserve the following records for all of the apartment complexes which they own and/or operate:

(a) The name, address and race of each person inquiring in person about the availability or terms of rental of an apartment therein, the date, and whether:

1. He was offered an application.

2. He filled out an application.

3. He submitted an application.

4. The application was sent to the central office.

5. He made a deposit.

6. He was accepted for waiting list.

7. His application was approved and he was accepted for occupancy.

8. His application was rejected, and, if so, the reasons therefor.

(b) The number of apartments available on each of the above dates, the type of apartments (i. e., one bedroom, two bedroom, etc.) available, the type of apartment requested by each person, and all vacancy and other information required to be reported to the Court under the reporting provisions of this Order.

It is further Ordered that ninety days after the entry of this Order, and at

three-month intervals thereafter for a period of three years following the entry of this Order, the defendants shall serve on counsel for the plaintiff a report containing the following information for each apartment they own and/or operate:

(a) The name, address and race of each person making inquiry about the availability or terms of rental of an apartment during the preceding three-month period, and whether such person:

1. Made inquiry.

2. Was offered an application.

3. Filled out an application.

4. Submitted an application.

5. Had their application sent to the central office.

6. Made a deposit.

7. Were accepted for a waiting list.

8. Were accepted for occupancy.

9. Were rejected, and if rejected, the reasons therefor.

Said defendants shall further report, with respect to each vacancy at each apartment complex owned or operated by any of them during the reporting period,

(a) The building and the apartment number;

(b) The date notification was received that the apartment would become available for rent;

(c) The date the apartment became available for rent;

(d) The date the apartment was no longer available for rent; and

(e) The date that the apartment was occupied by a new tenant and the name of and race of the new occupant or occupants.

Additionally, for each apartment complex owned or operated by any of them, the defendants shall include in the first report the number of persons or families, by race, who are residing there at the time of the entry of this Order.[9]

In the event that defendants acquire any other apartment building subsequent to the entry of this Order, they shall furnish plaintiff's counsel with the location and name (if there is one) of such apartment building and the racial composition of the building by unit. Further, if defendants sell or otherwise dispose of any apartment building owned or operated by them at the time of the entry of this Order, they shall furnish plaintiff's counsel with the location and the name (if there is one) of the apartment building. Such notification shall be provided within 20 days of the effective date of the change, or at the time the next report is due, whichever is earlier.

The first report[10] to be served hereunder shall describe the preliminary affirmative steps defendants have taken to implement the provisions of this Order. The report shall include, among the other things set forth in Part II, sample copies of all advertising used by defendants, copies or descriptions of all signs posted in accordance with this Order, apartment vacancy reports and written documentation to the effect that each agent or employee has received a copy of this Order and has been advised of its terms. It is further Ordered that:

1. The defendants' keeping of racial records for the purpose of complying with this Order shall not be considered discriminatory.

2. Representatives of the United States shall be permitted to inspect and copy all pertinent records of the defendants at any and all reasonable times, provided, however, that the United States shall endeavor to minimize any inconvenience to the defendants caused by the inspection of such records.

It is further Ordered that the plaintiff shall recover of the defendants its costs of suit.

The Court shall retain jurisdiction of this action for all purposes.

9. This information should set out the number of units occupied by persons of each race.

10. This report shall contain information regarding the number of persons, by race, who are residing at each of the apartment buildings owned or operated by defendants at the time of the entry of the Order.

APPENDIX "A" *

| Apartment | Began Operation | Number of Units | Bedroom Size | Rental Price Range and Security Deposit | Number of Blacks at Time of Suit | Date of Rental to First Black Tenant |
|---|---|---|---|---|---|---|
| Americana 707 Continental Circle Mountain View, Calif. | October 1969 | 486 unfurnished | 1, 2, & 3 bedrooms | $175–360 $150–250 | 0 | September 1971 |
| Tan Manor 535 Everett Avenue Palo Alto, Calif. | December 1964 | 90 furnished & unfurnished | Studios | $160–200 1 month's rent | 0 | None |
| Tan Plaza Continental 580. Arastradero Road Palo Alto, Calif. | August 1965 | 61 unfurnished | 1, 2, & 3 bedrooms | $255–495 1 month's rent | 0 | None |
| Poinciana Park Klamath and Hartford Santa Clara, Calif. | February 1970 | 55 unfurnished | 1, 2, & 3 bedrooms | $160–290 $120–220 | 0 | June 1971 |
| Sunshine Gardens 132–150 West Dana Mountain View, Calif. | February 1970 | 44 furnished & unfurnished | 1, 2, & 3 bedrooms | $145–270 1 month's rent | 0 | None |
| No. 733–743 Waverly Street Palo Alto, Calif. | March 1961 | 6 unfurnished | 1 & 2 bedrooms | $150–180 1 month's rent | 0 | None |
| Tan Plaza International 535 Arastradero Road Palo Alto, Calif. | August 1963 | 44 furnished & unfurnished | Studios, 1, 2, & 3 bedrooms | $170–350 1 month's rent | 1 | January 1970 |
| No. 5 Newell Road Palo Alto, Calif. | February 1969 | 12 furnished & unfurnished | 1 & 2 bedrooms | $145–200 1 month's rent | 2 | February 1969 |
| Tan House 5, 35, 45, 55 Newell Road Palo Alto, Calif. | September 1962 | 120 furnished & unfurnished | Studios, 1 & 2 bedrooms | $120–210 1 month's rent | 5 | December 1970 |
| Tan Village 1071–1094 Tanland Drive Palo Alto, Calif. | August 1964 | 168 furnished & unfurnished | 1, 2, & 3 bedrooms | $145–390 $120–320 | 4 | June 1968 |
| Tan Plaza 535 Arastradero Road Palo Alto, Calif. | December 1959 | 37 furnished & unfurnished | Studios, 1, 2, & 3 bedrooms | $140–240 1 month's rent | 2 | September 1970 |

* This information was obtained from Plaintiff's Exhibit 5 and Defendants' Exhibit 1.

## APPENDIX B

### EXPERIENCES OF WHITE AND BLACK TESTERS AND BLACK BONA FIDES AT TAN APARTMENT COMPLEXES

| Name of Witness | Name of Apartment Complex | Date of Inquiry | Was Witness Told Credit Check Or Other Delay For Processing Application? | | Was Witness Told That Type of Unit Asked For Was Available? | | Actual Existence of Vacancies Per Defendants' Records | Source of Supporting Testimony |
|---|---|---|---|---|---|---|---|---|
| | | | YES | NO | YES | NO | | |
| **WHITE WITNESSES** | | | | | | | | |
| Gross | Tan House | 1–24–71 | | X | X | | | RT–I 173–175 (A–5) |
| Bredt | Tan House | 9–11–69 | | | | X[1] | | D. Ex. BA pp. 14–15 RT–II 123–127 |
| Gross | Tan Manor | 1–24–71 | | X | X | | | RT–I 174–175, 181, 195 |
| Murphy | Tan Manor | 7–14–71 | | | X | | | RT–II 242–245 |
| Gross | Tan Village | 1–24–71 | | X | X | | | RT–I 174–179 |
| Gross | Americana | 2–7–71 | | X | X | | | RT–I 175–176, 234 |
| Brandt | Americana | 1–6–71 | | X | X | | | P. Ex. 4–a, RT WB–12–17, 52–53, 71–73 |
| Smith | Americana | 1–6–71 | | X | X | | | P. Ex. No. 4 (b) |
| Gross | Sunshine Gardens | 2–7–71 | | X | X | | | RT–I 177–178, 212–213 |
| Gross | Tan Plaza International | 2–7–71 | | X | X | | | RT–I 179–180, 228–229 |
| Gross | Tan Plaza | 2–7–71 | | X | X | | | RT–I 180–181, 230–233 |
| Smith | Tan Plaza | 1–6–71 | | X | | X | | P. Ex. No. 4 (b) |
| Gross | Tan Plaza Continental | 2–7–71 | | X | | X | | RT–I 178–179, 222–227, 233 |
| Smith | Tan Plaza Continental | 1–6–71 | | X | X | | | P. Ex. No. 4 (b) |
| **BLACK WITNESSES** | | | | | | | | |
| Johnson | Tan House | 1–24–71 | | | | X | 1 | RT–II 187–188, 202 P. Ex. 1 (A–5) |
| Fitch | Tan House | 9–11–69 | | | | X[2] | | RT–II 81–87 D. Ex. AK, BA, & U |
| Evans | Tan House | 9–12–69 | | | | X[3] | | RT–II 150–155 |
| Davenport | Tan House | mid. Aug. –70 | | | | X | 1 | P. Ex. 1 (B–1) |
| Johnson | Tan Manor | 1–24–71 | X | | | X | | RT–II 188–190, 202 |
| Wimberly | Tan Manor | 7–14–71 | | | | X | 10[4] | RT–II 270–273, P. Ex. 2 D. Ex. AS, pp. 25–26, 42–43 |
| Johnson | Tan Village | 1–24–71 | X | | | X | 9[5] | RT–II 190, 202, P. Ex. 1(A4) |
| Davenport | Tan Village | mid. Aug. –70 | | | | X[6] | 1 | P. Ex. 1 (B–2), see week of Aug. 9 and 16, 1970 |
| Johnson | Americana | 2–7–71 | X | | X | | | RT–II 190–192, 202 |
| McCullen | Americana | 1–6–71 | X[7] | | X | | | RT–AM 8–10, 12, 15–16 P. Ex. 4–c |
| Johnson | Sunshine Gardens | 2–7–71 | X | | | X | | RT–II 192–193, 202 |
| Johnson | Tan Plaza International | 2–7–71 | X | | | X | | RT–II 194, 202 |
| Johnson | Tan Plaza | 2–7–71 | X | | | X | | RT–II 193, 202 |
| McCullen | Tan Plaza | 1–6–71 | X | | | X | | P. Ex. 4(c), RT–AM, pp. 16–18 |
| Johnson | Tan Plaza Continental | 2–7–71 | X | | X | | | RT–II 193–194, 202 D. Ex. AR, p. 65 |
| McCullen | Tan Plaza Continental | 1–6–71 | X | | X | | | P. Ex. 4(c), RT–AM, pp. 18–26 |

[1] Bredt was told that a 1 bedroom apartment would be available in 3 days and was invited back to see similar apartment next day.

[2] Fitch was told that a 1-bedroom apartment would be available in 16 days and quoted a rental price $20 higher than white witness in footnote 1.

[3] Evans requested a 1-bedroom apartment and was told that only a studio apartment was available. He was also told that a 1-bedroom apartment would not be available for 8 days. He also inquired about the price of a 1-bedroom apartment and was quoted a rent of $185 per month, which was $20 in excess of rent quoted to white witness. (See footnote 1).

[4] In addition, four studios were to become vacant by 8–14–71.

[5] In addition, three 2-bedroom apartments were to become vacant by 2–8–71.

[6] Mrs. Roberts did not, however, tell Mrs. Davenport about Apartment No. 90/104, an unfurnished 1-bedroom apartment which was vacant at the time. (See P. Ex. 1, Part B(2). Particular reference should be made to the weekly vacancy reports for August 9 and 16, 1970.)

[7] McCullen was quoted a security deposit which was $40 more than the two white testers (i. e., Brandt and Smith) who went to the Americana on the same day.

# APPENDIX "C"

## RULES AND REGULATIONS  3429

# Title 24—HOUSING AND URBAN DEVELOPMENT

**Chapter I—Office of Assistant Secretary for Equal Opportunity, Department of Housing and Urban Development**

SUBCHAPTER A—FAIR HOUSING

[Docket No. R–72–165]

### PART 110—FAIR HOUSING POSTER

The purpose of this regulation is to require the display of a fair housing poster by persons subject to sections 804–806 of the Civil Rights Act of 1968 and to prescribe the content of this poster.

Notice of a proposed amendment to Title 24 to include a new Part 72 was published in the FEDERAL REGISTER on August 4, 1971 (36 F.R. 14336). (Under the reorganization of Title 24 published in the FEDERAL REGISTER on December 22, 1971 (36 F.R. 24402), the fair housing poster will become new Part 110.) Comments were received from approximately 20 interested persons and organizations and consideration has been given to each comment.

Some comments with respect to proposed § 72.10 criticized the coverage of the proposed regulation as too broad, while other comments objected that the coverage is too narrow, and various suggestions were made for changes in coverage. Comments were directed not only to what dwellings should be included but also to the stage at which the requirement should take effect and the persons to whom it should apply. In response to the comments, § 72.10(a) (now § 110.10 (a) and (b)) has been revised to clarify the extent of coverage, to broaden coverage to the extent appropriate and to eliminate unnecessary burdens where the requirement can appropriately be narrowed or eliminated. Under § 110.10 (a) and (b), display of the prescribed poster at a single-family dwelling is not required unless the dwelling is being offered for sale or rental in conjunction with the sale or rental of other dwellings; however if a real estate broker or agent is handling the sale or rental, he must display the poster at any place of business where the dwelling is being offered for sale or rental. With respect to all other dwellings covered by the Act, the poster must be displayed at any place of business where the dwelling is offered for sale or rental; in addition, the poster must be displayed at the dwelling, except that in the case of a single-family dwelling being offered for sale or rental in conjunction with the sale or rental of other dwellings, e.g., a subdivision, the poster may be displayed at model homes instead of at each of the individual dwellings. Finally, in the case of dwellings other than a single-family dwelling not being offered for sale or rental in conjunction with the sale or rental of other dwellings, the poster must be displayed from the beginning of construction through the end of the sale or rental process.

Several comments suggested revisions in the language of the poster described in proposed § 72.25. Such suggestions included rewriting the poster in terms of the individual's rights rather than the Act's prohibitions, adding additional prohibitions contained in the Act, emphasizing the nature of penalties for failure to post, and listing the HUD area office instead of the regional office as a location to which to send complaints. The new § 110.25 adopts the suggestion with regard to the area offices in that the poster will provide for insertion of the address of the regional or area office as appropriate. It has been decided that instead of lengthening the content of the poster by adding additional prohibitions, the poster should be made shorter and easier to understand by briefly highlighting the major prohibitions. In addition, the Equal Housing Opportunity logotype and slogan have been inserted at the top of the poster.

A comment by the Federal Home Loan Bank Board (FHLBB) recommended exempting from this regulation any person subject to a regulation of the FHLBB requiring that person to post a poster substantially similar in content to the poster described in HUD's regulation. A similar comment was made by the Board of Governors of the Federal Reserve System with respect to entities subject to supervision by any of the four Federal financial regulatory agencies. The Department will authorize a person subject to the jurisdiction of a Federal financial regulatory agency to utilize a poster prescribed in a regulation by such agency, and approved by the Department, instead of the poster prescribed by HUD. However, all of the other requirements of Part 110 will remain fully applicable regardless of whatever sanctions the regulatory agency prescribes for failure to comply with its regulation. This provision is set forth in § 110.25(b). The requirement, set forth in § 110.10(c), that financial institutions post and maintain a fair housing poster will not be effective until May 1, 1972, in order to allow time

for the Federal financial regulatory agencies to issue appropriate regulations.

Proposed § 72.30 stated that a failure to display the poster as required would be deemed a discriminatory housing practice, i.e., an act unlawful under sections 804, 805, and 806 of title VIII, and prima facie evidence of a violation of those sections, as applicable. There were comments favoring this provision and a comment stating that such a provision was beyond the Department's authority on the ground that title VIII prescribes the specific acts of discrimination which are unlawful. There was also a comment recommending that failure to comply should subject a person to suspension from eligibility for FHA insurance.

The Department believes that it has the authority to require a fair housing poster, and that proposed § 72.30 does not prescribe a new violation not provided for in title VIII. Rather, the section provides an appropriate evidentiary mechanism for assisting in the determination of whether a violation of title VIII has occurred. For purposes of clarity, the provision has been combined with proposed § 72.35—complaints—into a new § 110.30—Effect of failure to display poster—and the combined text shortened. Under § 110.30, when a person claiming to have been injured by a discriminatory housing practice files a complaint pursuant to Part 105—Fair Housing, a failure to display the required poster shall be deemed prima facie evidence of such practice.

The comment with respect to application of additional sanctions is rejected, since such sanctions as well as others are provided in the Affirmative Fair Housing Marketing Regulations published January 5, 1972 (37 F.R. 75), for failure to make the posting required at FHA project sites by § 200.620(f) of that regulation. Although Part 110 is applicable to some persons who are not covered by the Affirmative Fair Housing Marketing regulations, the Department considers that the insertion in Part 110 of the sanctions proposed in the comment is not appropriate.

Accordingly, a new Part 110 is added to Title 24 to read as follows:

#### Subpart A—Purpose and Definitions

Sec.
110.1   Purpose.
110.5   Definitions.

#### Subpart B—Requirements for Display of Posters

110.10   Persons subject.
110.15   Location of posters.
110.20   Availability of posters.
110.25   Description of posters.

#### Subpart C—Enforcement

110.30   Effect of failure to display poster.

AUTHORITY: The provisions of this Part 110 are issued under section 7(d) of the Department of Housing and Urban Development Act of 1965 (42 U.S.C. 3535(d)).

## Subpart A—Purpose and Definitions

### § 110.1   Purpose.

The regulations set forth in this part contain the procedures established by the Secretary of Housing and Urban Development with respect to the display of a fair housing poster by persons subject to sections 804–806 of the Civil Rights Act of 1968, 42 U.S.C. 3604–3606.

### § 110.5   Definitions.

(a) "Department" means the Department of Housing and Urban Development.

(b) "Discriminatory housing practice" means an act that is unlawful under section 804, 805, or 806 of title VIII.

(c) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(d) "Family" includes a single individual.

(e) "Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy, receivers and fiduciaries.

(f) "Secretary" means the Secretary of Housing and Urban Development.

(g) "Fair housing poster" means the poster prescribed by the Secretary for display by persons subject to sections 804–806 of the Civil Rights Act of 1968.

(h) "The Act" means title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3601 et seq.

(i) "Person in the business of selling or renting dwellings" means a person as defined in section 803(c) of the Act.

## Subpart B—Requirements for Display of Posters

### § 110.10   Persons subject.

(a) Except to the extent that paragraph (b) of this section applies, all persons subject to section 804 of the Act, Discrimination in the Sale or Rental of Housing, shall post and maintain a fair housing poster as follows:

(1) With respect to a single-family dwelling (not being offered for sale or rental in conjunction with the sale or rental of other dwellings) offered for sale or rental through a real estate broker,

agent, salesman, or person in the business of selling or renting dwellings, such person shall post and maintain a fair housing poster at any place of business where the dwelling is offered for sale or rental.

(2) With respect to all other dwellings covered by the Act:

(i) A fair housing poster shall be posted and maintained at any place of business where the dwelling is offered for sale or rental, and

(ii) A fair housing poster shall be posted and maintained at the dwelling, except that with respect to a single-family dwelling being offered for sale or rental in conjunction with the sale or rental of other dwellings, the fair housing poster may be posted and maintained at the model dwellings instead of at each of the individual dwellings.

(3) With respect to those dwellings to which subparagraph (2) of this paragraph applies, the fair housing poster must be posted at the beginning of construction and maintained throughout the period of construction and sale or rental.

(b) This part shall not require posting and maintaining a fair housing poster:

(i) On vacant land, or

(ii) At any single-family dwelling, unless such dwelling

(a) Is being offered for sale or rental in conjunction with the sale or rental of other dwellings in which circumstances a fair housing poster shall be posted and maintained as specified in paragraph (a)(2)(ii) of this section, or

(b) Is being offered for sale or rental through a real estate broker, agent, salesman, or person in the business of selling or renting dwellings in which circumstances a fair housing poster shall be posted and maintained as specified in paragraph (a)(1) of this section,

(c) All persons subject to section 805 of the Act, Discrimination in the Financing of Housing, shall post and maintain a fair housing poster at all their places of business which participate in the financing of housing.

(d) All persons subject to section 806 of the Act, Discrimination in the Provision of Brokerage Services, shall post and maintain a fair housing poster at all their places of business.

§ 110.15   Location of posters.

All fair housing posters shall be prominently displayed so as to be readily apparent to all persons seeking housing accommodations or financial assistance or brokerage services in connection therewith as contemplated by sections 804–806 of the Act.

§ 110.20   Availability of posters.

All persons subject to this part may obtain fair housing posters from the De-

partment's regional and area offices. A facsimile may be used if the poster and the lettering are equivalent in size and legibility to the poster available from the Department.

§ 110.25   Description of posters.

(a) The fair housing poster shall be 11 inches by 14 inches and shall bear the following legend:

## EQUAL HOUSING OPPORTUNITY

We Do Business in Accordance With the Federal Fair Housing Law

(Title VIII of the Civil Rights Act of 1968)

IT IS ILLEGAL

TO DISCRIMINATE AGAINST

ANY PERSON BECAUSE OF RACE,

COLOR, RELIGION, OR NATIONAL ORIGIN

- In the sale or rental of housing or residential lots.
- In advertising the sale or rental of housing.
- In the financing of housing.
- In the provision of real estate brokerage services.
- Blockbusting is also illegal.

Anyone who feels he has been discriminated against should send a complaint to:

U.S. Department of Housing and Urban Development, Assistant Secretary for Equal Opportunity, Washington, D.C. 20410
    or
HUD Region or

[Area Office stamp]

(b) The Assistant Secretary for Equal Opportunity may grant a waiver permitting the substitution of a poster prescribed by a Federal financial regulatory agency for the fair housing poster described in paragraph (a) of this section. While such waiver remains in effect, compliance with the posting requirements of such regulatory agency shall be deemed compliance with the posting requirements of this part. Such waiver shall not affect the applicability of all other provisions of this part.

## Subpart C—Enforcement

§ 110.30   Effect of failure to display poster.

Any person who claims to have been injured by a discriminatory housing

practice may file a complaint with the Secretary pursuant to Part 105 of this chapter. A failure to display the fair housing poster as required by this part shall be deemed prima facie evidence of a discriminatory housing practice.

*Effective date.* This part shall be effective February 25, 1972, except for § 110.10(c) which shall be effective May 1, 1972.

Samüel J. Simmons,
*Assistant Secretary*
*for Equal Opportunity.*

[FR Doc.72-2262 Filed 2-15-72;8.45 am]